**24-1254**
**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

**JONATHAN LEE**, **ERIN LEE**, **NICOLAS JURICH**, and **LINNAEA JURICH**,
*Plaintiffs-Appellants,*

v.

**POUDRE SCHOOL DISTRICT R-1**,
*Defendant-Appellee.*

On Appeal from the United States District Court
For the District of Colorado
The Honorable Judge Nina Y. Wang
Case No.: 1:23-cv-01117-NYW-STV

**APPELLANTS' OPENING BRIEF**

J. Brad Bergford
Emily T. Davis
Illumine Legal LLC
8055 East Tufts Ave.
Suite 1350
Denver, Colorado 80237
(720) 815-0700
brad@illuminelegal.com
emily@illuminelegal.com

Richard P. Lawson
Jase Panebianco
America First Policy Institute
1777 N. Kent St.
14th Floor
Arlington, Virginia 22209
(813) 952-8882
rlawson@americafirstpolicy.com
jpanebianco@americafirstpolicy.com

Attorneys for *Plaintiffs-Appellants*
**_Oral Argument is Requested_**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iii

STATEMENT OF PRIOR OR RELATED APPEALS ............................................. vi

GLOSSARY ......................................................................................... vii

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT ................................................................ 3

ISSUES FOR REVIEW ............................................................................ 4

STATEMENT OF THE CASE ..................................................................... 5

   I.  FACTUAL BACKGROUND ................................................................ 5
   II.  PROCEDURAL BACKGROUND ......................................................... 12

SUMMARY OF THE ARGUMENT ............................................................. 15

STANDARD OF REVIEW ....................................................................... 16

ARGUMENT ...................................................................................... 19

   I.  THE FAC ESTABLISHES MONELL LIABILITY. ................................... 19
     a.  Parental Rights and the Fourteenth Amendment. ............................. 19
     b.  The Policies Violate the Fourteenth Amendment. ............................ 25
     c.  The District Court Erred in Denying Plaintiffs' Motion for Leave to Amend. ................................................... 34

CONCLUSION .................................................................................... 39

ORAL ARGUMENT STATEMENT ............................................................ 40

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .................................... 41

CERTIFICATE OF DIGITAL SUBMISSION ................................................. 42

CERTIFICATE OF SERVICE ................................................................... 43

ADDENDA .............................................................................. Addenda 1

i

ECF 58 – MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANTS' MOTION TO DISMISS -
FILED 12/19/2023 ....................................................................... Addenda 2

ECF 69 – MEMORANDUM OPINION AND ORDER
DENYING PLAINTIFFS' AMENDED MOTION FOR LEAVE
TO AMEND - FILED 05/16/2024 .......................................................... Addenda 48

ECF 70 – FINAL JUDGMENT – Filed 05/17/2024 ............................. Addenda 74

# TABLE OF AUTHORITIES

## Cases

*Bd. of Cnty. Com'rs of Bryan Ctny., Oklahoma v. Brown*,
    520 U.S. 397 (1997)......................................................................... 18

*Bryson v. City of Okla. City*,
    627 F.3d 784 (10th Cir. 2010)........................................................ 17

*Chilcoat v. San Juan County*,
    41 F.4th 1196 (10th Cir. 2022)...................................................... 16

*City of Canton, Ohio, v. Harris*,
    489 U.S. 378 (1989)......................................................................... 17

*Doe v. Woodward*,
    912 F.3d 1278 (10th Cir. 2019).................................................... 16

*Finch v. Rapp*,
    38 F.4th 1234 (10th Cir. 2022)...................................................... 17

*Gibson v. Cnty. Of Washoe, Nevada*,
    290 F.3d 1175 (9th Cir. 2002)....................................................... 18

*Hodgson v. Minnesota*,
    497 U.S. 417 (1990)................................................................. 27, 30

*Meyer v. Nebraska*,
    262 U.S. 390 (1923)................................................................. 20, 34

*Monell v. Dep't of Soc. Servs. of City of N.Y.*,
    436 U.S. 658 (1978)................................... 1, 2, 13, 16, 17, 19, 39

*Myers v. Oklahoma Cnty. Bd. of Cnty. Com'rs*,
    151 F.3d 1313 (10th Cir. 1998)..................................................... 18

*Parham v. J.R.*,
    442 U.S. 584 (1979).........................22, 23, 26, 27, 28, 29, 33, 35

*Pierce v. Soc'y of Sisters*,
    268 U.S. 510 (1925)......................................................... 16, 20, 33

*Prince v. Massachusetts*,
    321 U.S. 158 (1944) ................................................................... 27

*Quintana v. Santa Fe Cnty. Bd. Of Comm'rs*,
    973 F.3d 1022 (10th Cir. 2020) ................................................ 16

*Santosky v. Kramer*,
    455 U.S. 745 (1982) ........................................................ 23, 31, 32

*Schneider v. City of Grand Junction Police Dep't*,
    717 F.3d 760 (10th Cir. 2013) .................................................. 17

*Stanley v. Illinois*,
    405 U.S. 645 (1972) ................................... 21, 26, 30, 31, 32, 35

*Swanson v. Guthrie Indep. Sch. Dist. No. 1-L*,
    134 F.3d 694 (10th Cir. 1998) .................................................. 32

*Troxel v. Granville*,
    530 U.S. 57 (2000) ................................. 19, 20, 24, 25, 26, 34, 35

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) .................................................................. 17

**Statutes**

28 U.S.C. § 1291 ............................................................................. 3

28 U.S.C. § 1331 ............................................................................. 3

28 U.S.C. § 1343 ............................................................................. 3

Colo. Rev. Stat. § 1-2-101 ............................................................ 29

Colo. Rev. Stat. § 12-37.5-104 ..................................................... 29

Colo. Rev. Stat. § 13-15-101 ........................................................ 30

Colo. Rev. Stat. § 13-22-101(a) .................................................... 30

Colo. Rev. Stat. § 13-22-101(c) .................................................... 29

Colo. Rev. Stat. § 14-2-106 .......................................................... 29

iv

Colo. Rev. Stat. § 14-2-109.5 ................................................................. 29

Colo. Rev. Stat. § 18-12-112.5 ............................................................... 29

Colo. Rev. Stat. § 18-13-121 .................................................................. 29

Colo. Rev. Stat. § 18-13-122 .................................................................. 29

Colo. Rev. Stat. § 18-3-402 .................................................................... 29

Colo. Rev. Stat. § 18-3-403 .................................................................... 29

Colo. Rev. Stat. § 18-3-404 .................................................................... 29

Colo. Rev. Stat. § 18-3-405 .................................................................... 29

Colo. Rev. Stat. § 24-35-214 .................................................................. 29

## STATEMENT OF PRIOR OR RELATED APPEALS

There are no prior or related appeals.

# GLOSSARY

| | |
|---|---|
| DAUGHTERS | C.L., the daughter of Jonathan and Erin Lee, and H.J., the daughter if Nicolas and Linnaea Jurich |
| DISTRICT | Poudre School District R-1 |
| FAC | Plaintiffs' Proposed First Amended Complaint |
| GSA | Gender and Sexualities Alliance |
| GSA MEETINGS | Gender and Sexualities Alliance meetings held on May 4, May 11, and May 18, 2021. |
| JURICHES | Appellant Nicolas and Linnaea Jurich |
| LEES | Appellants Jonathan and Erin Lee |
| MTA | Plaintiffs' Amended Motion for Leave to Amend Complaint ( ECF 64) |
| MTA ORDER | District Court's Order Denying Plaintiffs' Amended Motion for Leave to Amend Complaint (ECF 69) |
| MTD | Defendants' Motion to Dismiss (ECF 29) |
| MTD ORDER | District Court's Order Granting Defendants' Motion to Dismiss (ECF 58) |
| POLICIES | The collection of Poudre School District R-1 formal and informal policies |
| WMS | Wellington Middle School |

## INTRODUCTION

This case arose after agents of the Defendant-Appellee Poudre School District R-1 ("District"), acting in furtherance of its formal and informal policies ("Policies"), instructed two 12-year-old girls that it might not be safe to discuss their gender identity with their parents. This appeal is based on the District Court's conclusion that the proposed First Amended Complaint ("FAC") failed to establish that the District's liability under the standards set forth in *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

The District Court erred on two grounds. First, it held that because the Policies did not prohibit disclosure to parents about a child's transgender status, they raised no constitutional concerns. Second, the District Court dismissed the statements of the District agents as isolated instances insufficient to establish municipal liability under *Monell*. As set out below, policies that discourage disclosure violate the Fourteenth Amendment by contravening the fundamental presumption that parents act in the best interest of their children. The FAC details that the statements made to the girls about their parents' trustworthiness were in harmony with and furtherance of the Policies. These Policies are based on the unlawful presumption that, when it comes to children questioning their own gender, it is the District that knows best, not the parents. As the statements to the girls were in furtherance of Policies that run counter to the fundamental rights of parents, the

1

FAC establishes *Monell* liability, and this Court should reverse the denial of leave to amend.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction to hear this case under 28 U.S.C. §§ 1331 and 1343 because Appellants raised Fourteenth Amendment claims. App. Vol. 2 at 0304 (¶¶ 226-242).[1]  This Court has jurisdiction under 28 U.S.C. § 1291 because the district court entered final judgment on May 17, 2024, and Appellants timely filed their notice of appeal on June 11, 2024.  App. Vol. 2 at 0378.

---

[1] Record citations will appear as "App. Vol. [#] at [Page #]."

## ISSUES FOR REVIEW

Do school district policies that discourage disclosure of a child's transgender status violate the Fourteenth Amendment's guarantee of parental rights?

## STATEMENT OF THE CASE

## I.    FACTUAL BACKGROUND

This case involves the experiences of Plaintiffs Jon and Erin Lee ("Lees") and Nick and Linnaea Jurich ("Juriches") (together, "Parents") and their 12-year-old daughters C.L. and H.J. (together, "Daughters"), respectively, who were sixth graders enrolled in the District's Wellington Middle School ("WMS"), located in Wellington, Colorado.  App. Vol. 2 at 0271-78, 0275, 0283 (¶¶ 19-28, 43, 101).  On three separate occasions, the Daughters attended Gender and Sexualities Alliance ("GSA") meetings hosted by WMS teacher Jenna Riep: C.L. attended on May 4, 2021, and H.J. the following two weeks on May 11 and May 18, 2021 (the three meetings together, "GSA Meetings").  App. Vol. 2 at 0273, 0275, 0283 (¶¶ 30, 49, 108).  The District had not informed the Parents that it was hosting these GSA meetings.  App. Vol. 2 at 0274 (¶¶ 37, 38).  Furthermore, Ms. Riep advised C.L. that the May 4 event was an "art club" meeting and not a GSA event.  App. Vol. 2 at 0275 (¶ 49).  The Juriches' daughter, H.J., did know she was attending a GSA event, but at the urging of a friend who believed the Juriches would disapprove of H.J. going to such a meeting, H.J. misled her parents by calling it an anime club meeting.  App. Vol. 2 at 0283(¶¶ 103-04).

While the GSA Meetings discussed general concepts of transgenderism, Ms. Riep also invited children to discuss their thoughts about their own gender.  App.

Vol. 2 at 0277-78, 0284 (¶¶ 63-64, 73, 111-13).  Children who "came out" as transgender during the meeting received toys, flags, and other swag as prizes.  App. Vol. 2 at 0277 (¶ 68).  Issues of suicide among transgender children were also discussed at the GSA Meetings.  App. Vol. 2 at 0280, 0284 (¶¶ 82, 112).

Most importantly, these GSA Meetings undermined the parent-child relationship by emphasizing that, while it was safe to discuss transgenderism with the District's agents, students may not be able to trust their parents with such conversations.  Specifically, the District's agents:

1. Suggested that discussing GSA materials at home with their families might be dangerous; App. Vol. 2 at 0274 (¶ 40);

2. Encouraged the children to treat the discussions as secret; *id.* (¶ 39);

3. Instilled a sense of distrust between the students and their parents, fomenting a breakdown of the parent-child trust-based relationship; App. Vol. 2 at 0278 (¶ 71);

4. Suggested that while it may be unsafe to have gender-related conversations with parents, it would be safe to discuss these issues with the District's agents.; *id.* (¶ 72);

5. Told C.L. that she ought not to feel pressured into discussing the GSA meeting with her parents; App. Vol. 2 at 0279 (¶ 76);

6. Told attending students that if anyone asks a participant about the meetings, they do not have to say anything; App. Vol. 2 at 0284 (¶ 114);

7. Advised H.J. that her parents may not be people with whom she should discuss the events of the GSA meetings; *id.* (¶75); and,

8. Stated to attendees, including C.L. and H.J., that they should not feel the need to tell their parents about the topics discussed at the GSA meetings; *id.* (¶ 116).

Bolstering the "trustworthiness" of the District's agents, Ms. Riep's co-presenter at the May 4, 2021, event, Kimberly Chambers (then substitute teacher at WMS), gave the children (including C.L.) her phone number and invited them to contact her at any time. App. Vol. 2 at 0273, 0276, 0279 (¶¶ 31, 56-60, 75).

The GSA meetings had an immediate, massive, and negative effect on the Daughters and Parents.

Despite numerous private conversations where Riep taught C.L. about gender issues prior to the May 4, 2021 GSA meeting, C.L. had never had any doubts about her gender; however, after that meeting, she announced to her parents that she would be transitioning to a boy. App. Vol. 2 at 0277, 0279-80 (¶¶ 66-67, 78-79, 84, 87). C.L. began a months-long decline, with much confusion over her gender and sexuality, consideration of suicidal thoughts, and—courtesy of the doubt sowed by the GSA meeting—distrust of her parents. App. Vol. 2 at 0280-81 (¶¶ 85, 89). C.L.'s

relationship with her father was considerably strained during the time she was considering transitioning (which she has since abandoned). App. Vol. 2 at 0281 (¶ 91).

H.J.'s experience was considerably worse. Like C.L., after attending the GSA meetings with Ms. Riep, H.J. began to question her gender. But, unlike C.L., H.J. fully withheld discussing her thoughts with her parents. App. Vol. 2 at 0285 (¶ 119). H.J. first began to have suicidal thoughts after attending the May 11 and 18 GSA events. App. Vol. 2 at 0286 (¶ 126). It is important to note that after the May 4 GSA meeting and before the May 11 meeting (which H.J. first attended), Plaintiff Erin Lee made a specific complaint to the WMS administration about the District's agents suggesting that parents may not be trustworthy. App. Vol. 2 at 0284 (¶ 109). Nevertheless, despite being put on notice as to the topics discussed, the GSA meetings that H.J. attended repeated the same suggestions about a lack of parental trustworthiness. *Id.* (¶¶ 114-15). H.J.'s decline continued throughout the fall of 2021, culminating in a suicide attempt—consuming a, fortunately, non-lethal amount of bleach—in December 2021. App. Vol. 2 at 0286-87 (¶¶ 128-132). H.J. recovered from her suicide attempt with a week-long stay in the hospital, followed by numerous sessions with therapists. App. Vol. 2 at 0287 (¶¶ 132-134).

When Ms. Riep and Ms. Chambers sowed doubts in the minds of 12-year-old girls about their gender and their own parents, they acted as agents of the District and in furtherance of its Policies.  The written Policies state, *inter alia*, that:

1. District agents "should not disclose information that may reveal a student's transgender or non-binary status to others, **including** students, **parents**, or community members" without student permission; App. Vol. 2 at 0292 (¶ 163) (emphasis added);

2. A "school counselor will work with the student in coming out to their family and others, **as appropriate**," with the determination of appropriateness left to the discretion of the counselor; App. Vol. 2 at 0293 (¶ 166) (emphasis added);

3. When District agents are "contacting or communicating with a parent/guardian of a transgender or non-binary student, school staff should use the name and pronouns that the student's parent or guardian use, unless the student requests otherwise;" *id.* (¶ 167);

4. District Agents should use the name and pronouns used by a child's parent on documents with or in front of the parent while concurrently using the name and pronouns elected by the child when at school and outside the presence of their parents; *id.* (¶ 168);

5.  If parents ask a District agent if a student uses a name different from the one they gave the child, the agent is to refuse to answer and send the parents to the school counselor; *id.* (¶ 169);

6.  If parents ask a District counselor about a child's gender, the counselor is directed to "use their professional judgment to determine" if the student's transgender status is to be revealed; *id.* (¶ 170);

7.  Counselors are to "balance the inherent right of parents and guardians to their student's information and the potential impact this sharing [of a child's transgender or non-binary status at school] could have on the student and the student's trust in sharing future concerns with the school counselor;" App. Vol. 2 at 0294 (¶ 176); and,

8.  District agents are to take the child's lead in determining if parents will be involved in a transition process; App. Vol. 2 at 0296 (¶¶ 181-82).

The Policies explicitly discouraged the District's agents from disclosing a child's transgender status disclosure to parents. The FAC details how the Policies were implemented:

1.  Students are instructed not to discuss the substance of GSA Meetings with parents; App. Vol. 2 at 0299 (¶¶ 205-06);

2.  District agents regularly receive training that discourages disclosure of a child's transgender status to his or her parents;  *id.* (¶ 207);

3. District agents are regularly instructed to use a child's preferred name and pronouns with the child and the birth name and pronouns with the child's parents; *id.* (¶ 208); and,

4. District agents would share information about a child's transgender status with colleagues through informal means, thereby reducing the chances of parental notification; App. Vol. 2 at 0300 (¶¶ 212, 214); and,

5. District agents sought internal guidance amongst themselves on how best to avoid disclosure; *id.* (¶ 210).

The District cannot plausibly claim to be ignorant of the impact these Policies would have on the parent/child relationship. Sensitivities about sexually themed topics are not foreign to public schools. For example, a majority of voters believe that boys should not be allowed in girls' bathrooms or locker rooms, that children should not be allowed to receive puberty blockers or sex change surgeries, that it is a form of child abuse for school staff to encourage a child to change his or her gender, and, most importantly, if a boy tells a teacher he wants to identify as a girl then the teacher or school should notify the parents. App. Vol. 2 at 0289 (¶ 145). Furthermore, the Policies ask District agents to use their discretion in "balanc[ing]" the "inherent right of parents and guardians to their student's information" against the District's interest in maintaining its own relationship with those students. App. Vol. 2 at 0294 (¶ 176). The conflict between (1) a parent's fundamental right to make decisions about the

best interests of their children and (2) the Policies' mandate to actively conceal a child's transgender status is self-evident and should have been obvious to the District.  App. Vol. 2 at 0288 (¶ 144).

## II.     PROCEDURAL BACKGROUND

Parents' initial complaint was filed on May 3, 2023.[2]  App. Vol. 1 at 0012.  The District filed a motion to dismiss ("MTD"), which was granted without prejudice on December 19, 2023 ("MTD Order").  App. Vol. 1 at 0136.  While ultimately concluding that Parents had standing, the MTD Order was based on two conclusions.  First, it emphasized that the interests of parents under the Fourteenth Amendment do not trump the deference owed to schools in the setting of curricula.  App. Vol. 1 at 0155-61.  Second, the District Court concluded that the original complaint did not "raise any claim," "assert any injury based," or "seek any relief" based on the Policies.  App. Vol. 1 at 0162.  As to the first point, the District Court misconstrued Plaintiffs' claim as it never sought to change the curriculum; as to the second point, the District Court erred as the Plaintiffs *did* make a claim based on the Policies.

---

[2] The original complaint included the Daughters and the Lees' son as plaintiffs, had an equal protection claim for the denial of gender support plan for the Lee's son, and included the Board of Education as an additional defendant.  The equal protection claim, the Daughters, the Lees' son, and the Board have all been removed from the FAC.

On January 12, 2024, Parents filed a motion for leave to amend ("MTA") containing the proposed FAC. App. Vol. 2 at 0182. The MTA clarified that the Plaintiffs' claims were based on the Policies and not an attempt to modify the curriculum. App. Vol. 2 at 0183-84. As the MTA argued, the FAC addressed two constitutional violations caused by the Policies: (1) the District's presumption that it knows better than parents as to the best interest of a child and (2) denying parents the information needed to exercise their fundamental right to seek alternative education venues. *Id*.

The FAC focuses on how the Policies discourage disclosure and how the District's agents acted in furtherance of the Policies at GSA Meetings. *Id*. The District effectively conceded that the Policies discourage disclosure in its response to the MTA. While noting that it is sometimes required by law to disclose a child's transgender status the District stated that under the Policies "disclosure is generally discouraged." App. Vol. 2 at 0328. On May 16, 2024, the District Court denied the MTA on the grounds that the amendment would be futile. App. Vol. 2 at 0374. Ignoring the concerns expressed in the MTD Order, the MTA Order focused on a new issue previously unaddressed by the District Court: municipal liability under *Monell.* App. Vol. 2 at 0360-61, 0366-74.[3] The District Court recognized that the

---

[3] *Monell* liability was unaddressed in the MTD Order and was only briefly raised by the District in its response to the MTA (covering just two of its fifteen pages). App. Vol. 2 at 0335-37.

Policies allow parents to be excluded from a child's transition but nevertheless found this unobjectionable because:

> The Guidelines **do not prohibit disclosure** to parents or guardians of information regarding a student's gender status or any curriculum regarding gender identity and gender expression issues, including but not limited to extracurricular GSA meetings.

App. Vol. 2 at 0368 (emphasis added).  With the relevance of the written Policies neutralized on the grounds that they "do not prohibit disclosure," the District Court failed to recognize that the statements at the GSA Meetings were in furtherance of the Policies.  The District Court found the statements at the GSA Meetings were isolated events limited in time and place: "they do not have any factual allegations about similar conduct outside of WMS or outside of that timeframe."  App. Vol. 2 at 0370.

This appeal was then timely filed on June 11, 2024.  App. Vol. 2 at 0378.

## SUMMARY OF THE ARGUMENT

The District's presumption of parental hostility is the underlying premise for discouraging disclosure of a child's transgender status.  This position is untenable in the face of over a century of Supreme Court precedent stating that fit parents are presumed to act in the best interests of their children.  Contrary to the District Court's holding, it is immaterial if the Policies prohibit or simply discourage disclosure. Any policy that presumes that government actors are more likely than parents to act in the best interests of their children violates the Fourteenth Amendment.  Whether staff is required to keep parents in the dark or simply encouraged to do so, the effect is the same: the State is unlawfully preventing parents from exercising their rights. And for bitter confirmation of the perils posed by policies where, by *design*, "disclosure is generally discouraged," one need look no further than the GSA Meetings, where the 12-year-old Daughters were told they should distrust their parents.

## STANDARD OF REVIEW

An order denying leave to amend is generally conducted on an abuse of discretion standard, but when—as here—the denial is based on futility, the review includes a *de novo* examination of the proposed complaint. *Quintana v. Santa Fe Cnty. Bd. Of Comm'rs*, 973 F.3d 1022, 1033 (10th Cir. 2020); *see also*, *Chilcoat v. San Juan County*, 41 F.4th 1196 (10th Cir. 2022) (*de novo* review conducted on amended complaint alleging *Monell* liability).  At this stage in the proceedings, the Court is to accept as true all the well-pleaded factual allegations in the proposed FAC, viewing them in the light most favorable to the Parents. *Chilcoat*, 41 F.4th at 1218.  A plausible claim is one where the court may draw a reasonable inference as to the defendant's liability; the allegations are to be read in the context of the entire complaint; and the quantum of proof needed is just enough to move liability from conceivable to plausible.  *Id*.

The FAC alleges that the District interfered with the Parent's ability to raise the Daughters.  Parental rights were among the first recognized as protected by the Fourteenth Amendment.  *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925).  As the Parents' claim is based on the District's implementation of the Policies, a fundamental-rights approach is used to examine the FAC. *Doe v. Woodward*, 912 F.3d 1278, 1300 (10th Cir. 2019).  Under this approach, government interference is

only tolerated when it is narrowly tailored to serve a compelling state interest. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

To establish the District's liability for the events at the GSA Meetings, Parents must meet the standards set out in *Monell*. This Court has held that municipal liability may be established by means of:

1. Formal policy;

2. Informal custom which is nevertheless permanent and settled in its application;

3. Decisions by policymakers with final authority;

4. Ratification by policymakers of acts by subordinates; or,

5. A failure to train or supervise employees with deliberate indifference to the potential for injury.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). Additionally, there must be a nexus between the Policies and the violation of the fundamental right. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760 (10th Cir. 2013).

Furthermore, it must be shown that the Policies' impact on the fundamental right at issue should have been known to the policymaker. *Finch v. Rapp*, 38 F.4th 1234 (10th Cir. 2022). The FAC must allege that the Policies were the moving force behind the constitutional violation. *City of Canton, Ohio, v. Harris*, 489 U.S. 378, 379 (1989). *Accord, Monell*, 436 U.S. at 694; *Myers v. Oklahoma Cnty. Bd. of Cnty.*

*Com'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998). The *moving force* analysis contains two elements: (1) the presence of a constitutional deprivation and (2) a causal link between said deprivation and a municipal policy or custom. This is distinct from the deliberate indifference standard applicable to policies which, unlike those in the present case, are facially lawful. *Bd. of Cnty. Com'rs of Bryan Ctny., Oklahoma v. Brown*, 520 U.S. 397, 398 (1997); *Gibson v. Cnty. Of Washoe, Nevada*, 290 F.3d 1175, 1185-86 (9th Cir. 2002) (discussing two paths for liability: one for invalid policies, and the "deliberate indifference" standard for the invalid application of otherwise valid policies).

## ARGUMENT

## I.    THE FAC ESTABLISHES MONELL LIABILITY.

There is essentially one issue before this Court: Did the Policies under which "disclosure is generally discouraged" affect the Parents' fundamental rights?

The statements made at the GSA Meetings about parental untrustworthiness can only be understood within the larger context of the Policies.  From this vantage point, the statements are not isolated incidents from rogue employees but the logical outcome of the District's presumptions against parents.  The Supreme Court's precedent on the presumptions due parents illustrates the fundamental flaw of the Policies, and the District Court's error in its *Monell* analysis.

### a.  Parental Rights and the Fourteenth Amendment.

The Fourteenth Amendment states that no State shall "deprive any person of life, liberty, or property without due process of law."  The Supreme Court has long recognized that this Amendment ensures more than just fair process, offering heightened protection when a government interferes with fundamental rights and liberties.  *See, e.g., Troxel v. Granville*, 530 U.S. 57, 65 (2000).  Writing for a plurality of the Court in *Troxel*, Justice O'Connor stated that "the interest of parents in the care, custody, and control of their children … is perhaps the oldest of the fundamental liberty interests recognized by this Court."  *Id*.  The framework running

throughout the Court's jurisprudence is the "presumption that fit parents act in the best interests of their children." *Id.* at 68.

The Court's earliest references to the primacy of parental rights arose in two 1920s cases addressing education. In *Meyer v. Nebraska*, 262 U.S. 390 (1923), the Court addressed language requirements in schools and sided with parents who wanted the option—contrary to State law—of instructing their children in a language other than English. The Court noted that regimes placing children at the service of the state are "wholly different from those upon which our institutions rest." *Id.* at 402. Recognizing that the ability to "establish a home and bring up children" was "long recognized at common law as essential to the orderly pursuit of happiness by free men," the Court struck the Nebraska statute as inconsistent with the Fourteenth Amendment. *Id.* at 399. Two years later, the Court addressed a statute requiring children to attend public rather than religious schools. *Pierce,* 268 U.S. at 510. The Court stated that:

> The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.

*Id.* at 535. Having established that the view of the parent, rather than the State, is the prime consideration in the upbringing of a child, the Court held that the statute violated the Fourteenth Amendment. *Id.* at 536.

The Court expanded the scope of parental rights in the arena of child custody fifty years later when it addressed the right of an unwed father to the custody of his children. *Stanley v. Illinois*, 405 U.S. 645 (1972). The father in *Stanley* alleged a violation of the Equal Protection Clause because, as an unwed father, he was presumed unfit for the custody of his children; by contrast, under Illinois law, married fathers and unwed mothers could only be deprived of custody after a hearing. *Id*. at 646. The State's ostensible purpose for this presumption against fitness was to further a child's "moral, emotional, mental, and physical welfare … and the best interests of the community." *Id.* at 652. Questioning how the State's mission could be furthered by a policy "separating children from fathers without a hearing," the Court stated that the "State registers no gain towards its declared goals when it separates children from the custody of fit parents." *Id.* The Court recognized that the interest of a man "in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection." *Id*. at 651. This deference and protection to a parent's interest in a child necessitates that, even if a State is correct in assuming that "most unmarried fathers are unsuitable and neglectful parents," not all unmarried fathers are to be stereotypically lumped into this basket without a hearing. *Id.* at 654. Because Illinois' regulations were based on "presuming rather than proving … [the father's] unfitness solely because it is more convenient," it violated the Fourteenth Amendment. *Id.* 657-58.

A few years later, the Court expanded the doctrine of parental rights when it addressed the parameters by which the state would take troubled children into its care. *Parham v. J.R.*, 442 U.S. 584 (1979). The Court started its analysis by recognizing that "Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children." *Id.* at 602. The *Parham* Court wrote that the law presumes parents know what is best for children and that parents act in the best interests of their children. *Id.* The Court stated:

> The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.

*Id.* While the law presumes that parents act in the best interest of the child, it is not blind to the possibility that some parents do not; however, as the Court stated, "the statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Id*. at 602-03 (emphasis in original). Going on:

> Simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state. The same characterizations can be made for a tonsillectomy, appendectomy, or other medical procedure. Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments … The fact that a child

may balk at hospitalization or complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority to decide what is best for the child … Neither state officials nor federal courts are equipped to review such parental decisions.

*Id*. at 603-04. *Parham* took care to note that the protection owed to a fit parent's presumed intent to act in the best interest of a child is not absolute—the deference owed this presumption is strong, but not an absolute veto. *Id*. at 604.

Just a few years after *Parham,* the Court again wrote of the importance of parental rights when addressing the process required when the State seeks to take custody of children. *Santosky v. Kramer*, 455 U.S. 745 (1982). *Santosky* addressed New York's preponderance of the evidence standard for the termination of parental rights. *Id.* at 748. The Court recognized that the:

> fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

*Id.* at 753-54. Given the protected interests of parents in the upbringing of their children, the Court held that termination hearings must be conducted with a clear and convincing evidentiary burden rather than the typical civil standard of preponderance of the evidence. *Id.* at 669.

In 2000, the Court addressed parental rights in reference to third-party visitation rights. *Troxel*, 530 U.S. at 57. The State of Washington had a statute that allowed any person to petition for visitation rights with a child. *Id.* at 60. Tommie Granville and Brad Troxel had two daughters, but after the father's early death, his parents sought visitation rights with their granddaughters. *Id.* at 60-61. While the mother did not object to the grandparents' petition, she did object to the frequency and duration of the visits ordered by the trial court. *Id.* at 61. Importantly, at no point was it alleged or found that the mother was unfit. *Id.* at 68. Writing for a four Justice plurality,[4] Justice O'Connor stated that the problem with the trial court's decision was that it "gave no special weight at all to … [the mother's] determination of her daughter's best interests … importantly, it appears that the Superior Court applied exactly the opposite presumption." *Id.* at 69. Justice O'Connor wrote that the record reflected that the judge "presumed the grandparents' request should be granted unless the children would be 'impact[ed] adversely.'" *Id.* O'Connor wrote that the trial court's reasoning "directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child." *Id.* O'Connor stated that Washington's visitation statute violated the Fourteenth Amendment because the State may not "infringe on the fundamental right of parents to make child-rearing

---

[4] Justices Thomas and Souter concurred in the judgment with separate opinions.

decisions simply because a state judge believes a 'better' decision could be made." *Id.* at 72-73.

### b.      The Policies Violate the Fourteenth Amendment.

The Policies run counter to every principle set out in the litany of Supreme Court cases above.  The Policies presume that the District can make better decisions than parents.  Rather than recognizing that parents have the maturity to make decisions that minors lack, the Policies presume that children have the capacity to make important decisions without parents even *knowing* about the child's choice. The Policies further presume that the District's agents can act in the best interests of children, free from any of the onerous burdens of proof and judicial processes, which the State must satisfy before it interferes with the parent/child relationship.  Lastly, the Policies are contemptuous of the law's presumption that fit parents act in the best interests of their children.

### i.   The Policies Presume the District Can Make Better Decisions Than Parents.

As Justice O'Connor noted in *Troxel*, the State is on thin ice when it takes action "simply because … [it] believes a 'better' decision could be made" by the government rather than a parent.  *Troxel*, 530 U.S. at 72-73.  The District's faith in its agents making "better" decisions than parents permeates the Policies.  The Policies repeatedly emphasize the point that its counselors know best when, or even *if*, a child's transgender status should be disclosed to parents.  The Policies state that

counselors should work with students in "coming out to their family … as appropriate." App. Vol. 2 at 0293 (¶ 166). Counselors are to "use their professional judgment to determine" if it is appropriate to advise parents about a child's transgender status. *Id.*(¶ 170).

The District's assumption that a counselor knows best about how a gender-questioning child interacts with his or her parents is completely incompatible with the Fourteenth Amendment. Aside from the issues of a child's capacity and the lack of judicial oversight discussed below, the District's presumption that parents may not be entitled to know the gender status of their child can only be justified by the concerns raised in its MTD about unsupportive families. App. Vol. 1 at 0077, ("Statistics show that transgender youth are much more prone to depression, anxiety, and suicide ideation, especially when they lack familial acceptance and support, and the complaint shows that C.L. and H.J. were not immune to these serious issues."). However, this type of stereotyping is *precisely* what the Court rejected in *Parham* when it stated that "the statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." 442 U.S. at 602-03 (emphasis in original). Any system—such as that implemented by the Policies—that presumes rather than requires proof of unfitness violates the Fourteenth Amendment. *Stanley*, 405 U.S. 657-58. The Policies run afoul of Justice O'Connor's concerns in *Troxel* that the

court process in Washington failed to give special weight to the mother's "determination of her daughter's best interests." 530 U.S. at 69; *see also, Hodgson v. Minnesota*, 497 U.S. 417, 483-84 (1990) (Kennedy, J., concurring) ("As a general matter . . . it remains 'cardinal with us that the custody, care, and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.'" (quoting, *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)).

> ii. <u>The Policies Presume that Children Can Make Important Decisions without the Knowledge or Involvement of Parents.</u>

The Supreme Court has recognized that parents compensate for what a "child lacks in maturity, experience, and capacity" and that a parent's "natural bonds of affection lead parents to act in the best interests of their children." *Parham*, 442 U.S. at 602.

The Policies completely reject these principles. First, the Policies assume that children have the capacity to make important health decisions. Second, the Policies encourage District agents to conspire with minors to keep parents in the dark when a child decides to abandon the name they gave at his or her birth. The Policies direct District agents to "not disclose information that may reveal a student's transgender or non-binary status to … parents" without student permission. App. Vol. 2 at 0292 (¶ 163). Staff are instructed to use the child's given name when interacting with parents unless the minor instructs the District's agents otherwise. App. Vol. 2 at

0293, 0299 (¶¶ 167, 208).  If a parent asks a faculty member directly if their child is using a name different from the one they gave the minor, the Policies direct the faculty to decline to answer and send the parent to the school's counselor.  App. Vol. 2 at 0293 (¶ 169).  District agents regularly received training that discouraged disclosure of transgender status to parents.  App. Vol. 2 at 0299 (¶ 207).  When District agents learned of a child's decision to transition, they would take steps to inform their colleagues in such a way as to minimize the risk of parental notification. App. Vol. 2 at 0300 (¶¶ 212, 214).  And, of course, the efforts to exclude parents were never more clearly on display than when, in the GSA Meetings, the District's agents told 12-year-old girls not to discuss the substance of the meetings with their parents and that it could be unsafe to discuss their own gender questions with their parents.  App. Vol. 2 at 0274, 0278-79, 0284, 0299 (¶¶ 39-41, 70- 72, 76-77, 114-16, 205-06).

This entire process is an affront to *Parham*'s rejection of the idea that just "because the decision of the parent is not agreeable to the child," the power to make the decision should transfer "from the parents to some agency."  442 U.S. at 603-04. "Most children," the Court wrote, "even in adolescence, simply are not able to make sound judgments" even regarding "their need for medical care."  *Id.*  "Parents can and must make those judgments," the Court continued, noting that even if a "child may balk at hospitalization or complain about a parental refusal to provide cosmetic

surgery," it remains the "parents' authority to decide what is best for the child." *Id.* Furthermore, consider the points raised in the District's MTD about the heightened risk of health issues for transitioning children. If the risks to a child's health are so great and if, as we know, the law presumes that the "natural bonds of affection lead parents to act in the best interests of their children," *Id.* at 602, then that is all the *more* reason for parents to be involved. From this perspective, not only is discouraging disclosure from fit parents unconstitutional, it is downright dangerous.

The District's policy to discourage disclosure is particularly baffling when placed in the larger context of Colorado's regulation of minors. Colorado law prohibits 12-year-old children from:

- Engaging in sexual activity; Colo. Rev. Stat. §§ 18-3-402, 18-3-405;

- Getting married; Colo. Rev. Stat. §§ 14-2-109.5, 14-2-106;

- Having an abortion without parental notification; Colo. Rev. Stat. § 12-37.5-104;

- Buying tobacco; Colo. Rev. Stat. § 18-13-121;

- Consuming alcohol; Colo. Rev. Stat. § 18-13-122;

- Playing the lottery; Colo. Rev. Stat. § 24-35-214;

- Owning guns; Colo. Rev. Stat. § 18-12-112.5;

- Voting; Colo. Rev. Stat. § 1-2-101;

- Suing someone in court; Colo. Rev. Stat. § 13-22-101(c);

- Entering into contracts; Colo. Rev. Stat. § 13-22-101(a); or,

- Legally changing his or her name without judicial action; Colo. Rev. Stat. § 13-15-101.

The limitation on a minor's legal autonomy is well supported in the American legal tradition. As Justice Kenney observed in *Hodgson*, the law, "does not give to children many rights given to adults, and provides, in general, that children can exercise the rights they do have only through and with parental consent." 497 U.S. at 482 (Kennedy, J., concurring). Nevertheless, the District thinks it's just fine for 12-year-old girls to not only change their name and gender but conspire with staff to hide this from their parents.

From start to finish, the Policies presume that parents may not act in the best interests of a child questioning his or her gender. As a result, at every opportunity, the Policies undermine the parent/child relationship on an issue fraught with concerns about the well-being of the child. However well-intentioned the District may have been, the Policies' practice of discouraging disclosure is based on the same type of stereotypical prejudices the Court condemned in *Stanley*.

*Stanley* held that a presumption against the fitness of unwed fathers was unconstitutional even if "most unmarried fathers are unsuitable or neglectful." 405 U.S. at 654. Holding that "all unmarried fathers are not in this category," the Court held that Illinois would have to prove, rather than presume, a father's unfitness. *Id.*

30

The Court held that splitting a child from a fit parent could never serve Illinois' stated policy to foster the moral and emotional welfare of minors. *Id.* at 652. So, too, with the Policies. Time and again they err against disclosure to the parents and defer to the minor's wishes or the judgment of District agents. The implementation of the Policies can only result in undermining of a child's trust in his or her parents, an end all too clearly on display with the experiences of the Daughters.

     iii.  <u>The Policies Allow District Agents to Act without Any Judicial Oversight.</u>

As the Court stated in *Santosky*, when the State seeks to affect the parent/child relationship, fair process is due to parents even though "they have not been model parents or have lost temporary custody of their child to the State." 455 U.S. at 753-54. The Policies afford no such protection even to those who have been model parents.

The Policies state that counselors are to "balance the inherent right of parents and guardians to their student's information and the potential impact this sharing [of a child's transgender or non-binary status at school] could have on the student and the student's trust in sharing future concerns with the school counselor." App. Vol. 2 at 0294 (¶ 176). While the District concedes that parents have a right to access their child's information, the call to balance this interest against the child's trust in a counselor allows the District's agents to frustrate the parents' inherent rights. The District vests itself with the plenary authority to deem a parent-child relationship as

less significant than a child-school counselor one.  The counselor has been granted this discretion not on the basis of a judicial determination after a full and fair hearing but on the District's own authority.  The District's opinion on the virtues of disclosure hardly suffices to meet the standard of "fundamentally fair procedures" required for interfering with parent/child relationships.  *Santosky*, 455 U.S. 753-754.

A parent's interest in his or her child "warrants deference and, absent a countervailing interest, protection." *Stanley*, 405 U.S. at 651.  The Policies' requirement to balance "the inherent right of parents … to their student's information" against the impact on a "student's trust in sharing future concerns with the school counselor" is completely misguided.  The District's interest in trust between students and its counselors is at naught compared to the right of parents to know about important issues affecting their child's health.

It is important to remember that the issue here is not the typical deference due to a school's coursework—the claims in the FAC rest on a best interest of the child analysis, not a challenge to the curriculum.  Judicial deference is owed on matters such as reading programs, community service requirements, discussions on sexually explicit topics, standardized testing, and certification.  *See, e.g.*, *Swanson v. Guthrie Indep. Sch. Dist. No. 1-L*, 134 F.3d 694 (10th Cir.  1998).  A child's decision to drop the name given by his or her parents is quite simply unrelated to whether a textbook describing the reproductive system meets adequate pedagogical standards.  The

Policies are not doing something so simple as establishing community service requirements or even discussing sexually explicit topics. The Policies are declaring that a parent's interest in knowing about his or her child's health is inferior to the State's interest in cultivating the child's trust. This is completely incompatible with the foundational principle that the "child is not the mere creature of the state." *Pierce*, 268 U.S. 535.

      iv.  <u>The Policies Reject the Presumption that Fit Parents Act in the Best Interests of their Children.</u>

The Policies cannot be harmonized with the presumption that fit parents act in the best interests of their children. The golden thread running through the Court's cases—from rejecting the idea that the State can make better decisions, that minors have the capacity for important health decisions, and the requirement that the State may only interfere with a parent's relationship on a strong showing of proof—is the presumption that the "natural bonds of affection lead parents to act in the best interests of their children." *Parham*, 442 U.S. at 602.

In addition to the practices outlined above, the Policies tell staff to use the parents' names and pronouns in front of parents and the child's name and pronouns outside of the presence of his or her parents. App. Vol. 2 at 0293 (¶ 168). The Policies also instruct staff to take the child's lead in determining if parents will be involved in a transition process. App. Vol. 2 at 0296 (¶¶ 181-82). None of the

portions of the Policies cited in the FAC can be harmonized with the presumption that fit parents act in the best interests of their children.

This presumption is as logical as it is well-founded.  As noted in *Meyer* over a century ago, parental rights derive from the common law understanding that the family is the bedrock "to the orderly pursuit of happiness by free men."  262 U.S. at 399.  This principle was central to Justice O'Connor's comment about the judicial process used in *Troxel,* where it will be remembered that the mother's objection was only to the frequency and duration of visits by the grandparents; she had no concern with the visits themselves.  530 U.S. at 60-61.  Condemning the trial court's failure to give "no special weight at all" to the mother's concerns, Justice O'Connor wrote that the trial court "directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child." 530 U.S. at 69.  If the judicial process in *Troxel*—where all parties were able to make their case before the court—was invalid under the Fourteenth Amendment, the Policies are nothing short of a constitutional train wreck.

### c.  The District Court Erred in Denying Plaintiffs' Motion for Leave to Amend.

The District Court erred on two grounds.  First, it erred when it held that policies that discourage but do not prohibit disclosure raised no constitutional issues.  Second, it erred when it found the statements of the District agents at the GSA

Meetings were those of rogue actors, rather than staff acting in conformity with and furtherance of the Policies.

### i. District Court's Error on the Policies

The fundamental error of the District Court was its conclusion that since the Policies "do not prohibit disclosure," they survive constitutional scrutiny. As detailed above, the Policies contradict every major principle of the Supreme Court's parental rights doctrine: presumptions against the State making better decisions than parents, the capacity of minors to make important decisions, the burdens of judicial oversight, and, most fundamentally, the presumption that fit parents act in the best interests of a child. The Court's decisions in *Parham*, *Stanley*, and *Troxel* were central to the Parent's MTA but were ignored in the District Court's Order; the District Court never referenced *Parham* or *Stanley* and gave only the most passing references to *Troxel*. And even then, *Troxel* never appears in the District Court's analysis of the District's guidelines. App. Vol. 2 at 0367-69. Rather, the District Court concluded that:

> The Guidelines do not prohibit disclosure to parents or guardians of information regarding a student's gender status or any curriculum regarding gender identity and gender expression issues, including but not limited to extracurricular GSA meetings.

App. Vol. 2 at 0368. The District Court never addressed the question of whether policies that "do not prohibit disclosure" are compliant with or run afoul of the Fourteenth Amendment, despite its central role in the Parents' MTA. Rather, having

concluded that the Policies "do not prohibit disclosure," the District Court then stated:

> Thus, this Court finds that the Guidelines alone are inadequate to satisfy the Plaintiff Parents' obligation to plead sufficient facts of the existence of … [a policy] that precludes parents from accessing full and accurate information "regarding the best interests of their children, and . . . the nature of the District's curriculum." *Cf. John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 622 F. Supp. 3d 118, 136 (D. Md. 2022).

App. Vol. 2 at 0369.  The District Court's focus on whether the District precludes "parents from accessing full and accurate information 'regarding the best interests of their children, and … the nature of the District's curriculum'" misses the mark by giving a pass to Policies that grant staff the *discretion* to keep parents ignorant about their children's gender status.

The Policies undermine the parent-child relationship based on *unfounded and unproven stereotypical prejudices* that the District's agents can make better decisions than parents about gender issues.  Among other points detailed above, the Policies direct District agents (1) to "not disclose information that may reveal a student's transgender or non-binary status to … parents" without student permission; App. Vol. 2 at 0292 (¶ 163); (2) to "work closely with the student to assess the degree, **if any**, the parent/guardian will be involved in the [transition] process;" App. Vol. 2 at 0296 (¶ 181) (emphasis added); (3) to use the child's given name when interacting with parents unless the minor instructs the District's agents otherwise; App. Vol. 2 at

0293, 0299 (¶¶ 167, 208); and (4) to refuse to answer a parent inquiring after their child's gender identity in school, directing said parent to the school's counselor; App. Vol. 2 at 0292 (¶ 169).

The District Court never engaged with the Supreme Court's jurisprudence on the deference due to parents and the high burdens placed on the state when interfering with the parent/child relationship.  By failing to recognize the Policies' overarching presumption that District agents, rather than parents, will act in the best interests of the child, the District Court failed to appreciate the statements at the GSA Meetings were nothing other than the implementation of the unconstitutional Policies.

ii.  <u>District Court's Error as to the GSA Meetings</u>

The GSA Meetings simply implemented the Policies' unconstitutional presumptions against parents.  Based on the stereotype that parents will not act in the best interest of their children, the District's agents furthered the District's goal of discouraging disclosure by telling 12-year-old girls that their parents will not be trustworthy on gender related issues.

The District's agents suggested that discussing GSA materials at home might be dangerous, urged children to trust District staff, and told each of the Daughters that they should carefully consider discussing the GSA Meetings with their parents. App. Vol. 2 at 0274, 0278-79, 0284 (¶¶ 40, 72, 76, 115).  These statements are in line

with the Policies that direct staff to switch names and pronouns when speaking to parents and grant counselors the discretion to disclose a child's transition with his or her parents.  App. Vol. 2 at 0293 (¶¶ 168-70).  It is vital to remember that nearly identical statements about parental trustworthiness were repeated at three separate GSA Meetings; as two meetings took place after the Lee family complained, the District was on full notice as to the scope of GSA Meetings.  App. Vol. 2 at 0273, 0275, 0284 (¶¶ 30, 49, 109).  All of these steps—discouraging disclosure, proselytizing distrust in parents, Riep's private conversations with C.L., and the District's knowledge of the topics discussed at the GSA Meetings H.J. attended— demonstrate that the Policies were the "moving force" for the statements at the GSA Meetings.

The District Court further erred by failing to recognize that this practice of secrecy undermined the Parents' ability to make informed decisions about their Daughters' educations.  For parental rights to be meaningful a parent must have access to important information; by *actively* discouraging disclosure, the Policies make a mockery of a parent's ability to act in the best interests of his or her child. Had the Lees and the Juriches known that the Daughters would be solicited to attend school sponsored meetings that discussed topics of a sexual nature, advocated transgenderism as a response to bodily discomfort, encouraged secret transitions, and warned that suicidal thoughts are a frequent part of the transition process, they

would have sought an alternative education venue. App. Vol. 2 at 0270, 0277, 0280-82, 0284, 0286, 0288 (¶¶ 11, 64-65, 73, 81, 89, 112 115-16, 126, 142-43). By running the GSA Meetings in harmony with the principles set out in the Policies, the District's agents frustrated the Parents' ability to act in the best interests of their children.

Because the FAC establishes that the statements at the GSA Meetings were in harmony with and furtherance of the Policies, the FAC establishes the District's liability under *Monell*.

## CONCLUSION

Based on the Policies' presumption of parental hostility to transitioning children, 12-year-old girls were told that their parents may be untrustworthy. This violates the Fourteenth Amendment.

The statements at the GSA Meetings were not the product of rogue actors but the implementation of the Policies. These Policies were drafted with the presumption that, when it comes to transitioning children, District staff will make better decisions than parents. Such a presumption is completely contrary to the law. The acts of the District agents at the GSA Meetings shattered the parent/child relationship. As this result was all too predictable given the Policies' presumption of parental hostility, the FAC adequately establishes *Monell* liability and the MTA Order should be reversed.

39

## ORAL ARGUMENT STATEMENT

Appellants respectfully request oral argument. This case involves important and complex Fourteenth Amendment issues that greatly affect Appellants' and others' constitutional freedoms. Oral argument will materially help this Court decide the issues.

Dated: August 21, 2024

Respectfully submitted,

*/s/ Richard P. Lawson*
Richard P. Lawson

J. Brad Bergford                          Richard P. Lawson
Emily T. Davis                            Jase Panebianco
Illumine Legal LLC                        America First Policy Institute
8055 East Tufts Ave.                      1777 N. Kent St.
Suite 1350                                14th Floor
Denver, Colorado 80237                    Arlington, Virginia 22209
(720) 815-0700                            (813) 952-8882
brad@illuminelegal.com                    rlawson@americafirstpolicy.com
emily@illuminelegal.com                   jpanebianco@americafirstpolicy.com

Attorneys for *Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A)**
Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements. And Type Style Requirements

1.      This brief complies with the type-volume limitations of Fed. R. App. P.

32(a)(7)(B) because this brief contains 8,581 words, excluding those portions of the

brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in a 14-point or greater proportionally spaced Roman style typeface

using Microsoft Office 365.


Dated: August 21, 2024


                                        *s/  Richard P. Lawson*
                                        Richard P. Lawson

## CERTIFICATE OF DIGITAL SUBMISSION

1.      I hereby certify that all required privacy redactions have been made.

2.      I hereby certify that seven (7) hard copies of the Appellants' Opening Brief will be submitted to the Court pursuant to 10th Cir. R. 31.5 and will be an exact copy of the version submitted electronically via the Court's ECF system.

3.      I hereby certify that this document has been scanned for viruses with the most recent version of a commercial virus scanning program, SentinalOne Agent, version 23.1.4.650 and is free of viruses according to that program.


Dated: August 21, 2024

                                                    *s/ Richard P. Lawson*
                                                    Richard P. Lawson

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2024, a true and accurate copy of this brief and addenda was electronically filed with the Court using the CM/ECF system, which will send notification of such filing to the following:

Jonathan Fero
Semple, Farrington, Everall & Case
1120 Lincoln Street
Suite 1308
Denver, CO 80203
Tele: (303) 595-0941
Email: jfero@semplelaw.com

*Attorney for Defendant-Appellee*

Dated: August 21, 2024

*s/ Richard P. Lawson*

Richard P. Lawson

# ADDENDA

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 23-cv-01117-NYW-STV

JONATHAN LEE,
ERIN LEE,
C.L., a minor, by and through parents Jonthan and Erin Lee as next friends,
M.L., a minor, by and through parents Jonathan and Erin Lee as next friends,
NICOLAS JURICH,
LINNAEA JURICH, and
H.J., a minor, by and through parents Nicolas and Linnaea Jurich as next friends,

      Plaintiffs,

v.

POUDRE SCHOOL DISTRICT R-1, and
POUDRE SCHOOL DISTRICT R-1 BOARD OF EDUCATION,

      Defendants.

---

**MEMORANDUM OPINION AND ORDER**

---

    This matter is before the Court on Defendants' Motion to Dismiss Plaintiffs' Complaint (the "Motion" or "Motion to Dismiss") [Doc. 29]. The Court has reviewed the Motion, the Parties' briefing, and the applicable case law, and concludes that oral argument would not materially assist in the resolution of the Motion. For the reasons set forth in this Order, the Motion to Dismiss is respectfully **GRANTED**.

**BACKGROUND**

    The Court draws the following facts from Plaintiffs' Complaint for Damages and Injunctive Relief (the "Complaint"), [Doc. 1], and presumes they are true for purposes of

this Order.[1]  Defendant Poudre School District R-1 (the "District") is a K-12 public school district in Larimer County, Colorado.  [*Id.* at ¶ 22].  Its schools include Rice Elementary School ("RES") and Wellington Middle School ("WMS"), which is now consolidated into Wellington Middle-High School.  [*Id.* at ¶¶ 15–16, 22].

The District runs an after-school organization called the Genders and Sexualities Alliance ("GSA") at a number its schools.  [*Id.* at ¶¶ 28–29].  The GSA is not "disclosed" as part of District curriculum.  [*Id.* at ¶ 30].  Plaintiffs allege that GSA meetings "regularly address sex, sexualities, mental health, suicide, sexual orientation, gender identities, and other topics in discussions, lectures, and distributed materials."  [*Id.* at ¶ 123].

A GSA meeting was held at WMS on May 4, 2021.  [*Id.* at ¶¶ 41–42].  Plaintiff C.L., then a 12-year-old sixth grader at WMS, attended the meeting after being personally invited by her homeroom and art teacher.  [*Id.* at ¶¶ 36, 40, 42].  According to Plaintiffs, topics discussed at the May 4 meeting included polyamory, suicide, puberty blockers, gender identity, sexualities, changing names or pronouns, and "[k]eeping the discussions at GSA secret from parents."  [*Id.* at ¶ 60].  Plaintiffs allege that a part-time District teacher,

---

[1] Attached to Plaintiffs' Complaint is a document titled "Guidelines for Supporting Transgender and Non-Binary Students" (the "Guidelines").  [Doc. 1-1].  In ruling on a motion to dismiss under Rule 12(b)(6), a court "may . . . consider documents attached to or referenced in the complaint if they 'are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'"  *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).  Defendants do not dispute the Guidelines' authenticity, and rely upon their language to support arguments that dismissal is proper.  [Doc. 29 at 6–7].  But Defendants also note that the Guidelines state that they were "Revised 1-13-2023," *see, e.g.*, [Doc. 1-1 at 2], and "were not in existence" when the circumstances giving rise to this case occurred, [Doc. 29 at 15].  Plaintiffs do not respond to this assertion.  *See* [Doc. 37].  To the extent that there is a conflict between the allegations by Plaintiff about the Guidelines and the contents of the Guidelines, the exhibit controls.  *See Brokers' Choice*, 861 F.3d at 1105.

Addenda 003

who had been invited to be a "guest speaker" at the meeting, "told the children that if they are not completely comfortable in their bodies, that means that they are transgender." [*Id.* at ¶¶ 49–50, 54]. The part-time teacher also "awarded prizes in the [sic] LGBTQ paraphernalia such as toys, flags, and other swag" to students who came out as transgender. [*Id.* at ¶ 56]. Plaintiffs allege that several students in attendance announced that they are transgender, and, "feeling pressure to do the same and wanting to receive [the teacher's] prizes," C.L. also announced that she is transgender. [*Id.* at ¶ 57]. After the GSA meeting, C.L. announced to her mother, Plaintiff Erin Lee ("Ms. Lee"), that "she would be transitioning," although she had never expressed such sentiments to her parents before. [*Id.* at ¶¶ 66–67].[2] The day after the meeting, Ms. Lee and C.L.'s father, Jonathan Lee ("Mr. Lee," and collectively with Ms. Lee, the "Lees"), disenrolled C.L. from WMS and enrolled her in a private school for the next academic year. [*Id.* at ¶ 69]. Plaintiffs allege that "C.L.'s experience at the GSA club led to a months-long emotional decline of gender and sexuality confusion that required counseling and included suicidal thoughts." [*Id.* at ¶ 75].

Plaintiff H.J., then a 12-year-old sixth grader at WMS, attended GSA meetings on May 11 and May 18, 2021. [*Id.* at ¶¶ 90, 97]. At these meetings, Plaintiffs allege, it was suggested to the student attendees that "if they did not like their bodies, they were most likely not the gender they were 'assigned' at birth." [*Id.* at ¶ 102]. H.J. was also taught about gender fluidity and "the heightened connections between transgenderism and suicide." [*Id.* at ¶¶ 100–01]. After attending the GSA meetings, H.J. "began to have her first suicidal thoughts." [*Id.* at ¶ 113]. Throughout the summer of 2021, H.J. began leaving

---

[2] Plaintiffs allege that C.L. "has since abandoned" this announcement. [Doc. 1 at ¶ 70].

Addenda 004

notes for her parents, Plaintiffs Nicolas Jurich ("Mr. Jurich") and Linnaea Jurich ("Ms. Jurich," and collectively with Mr. Jurich, the "Juriches"), about "transgenderism" and being aromantic or asexual.  [*Id.* at ¶ 114].  In the fall of 2021, H.J. began to question her gender identity.  [*Id.* at ¶ 115].  H.J. then "underwent a significant emotional decline," and in December 2021, requested to be homeschooled.  [*Id.* at ¶ 117].  Shortly thereafter, H.J. attempted suicide.  [*Id.* at ¶ 118].

Plaintiffs allege that the District and the Poudre School District R-1 Board of Education (the "Board," and collectively with the District, "Defendants") engaged in a pattern and practice of keeping the GSA activities secret from District parents in that they failed to disclose GSA activities to parents and encouraged students to not discuss GSA activities with their parents.  [*Id.* at ¶¶ 31–33]; *see also, e.g.*, [*id.* at ¶¶ 58, 104].  Plaintiffs allege that, in the District, school-sponsored clubs are "considered part of the school program and/or relate[] to a school's curriculum," [*id.* at ¶ 184], and that the District has a policy that requires written notice to parents or guardians of any curriculum that is "part of the District's comprehensive health education program," which includes notice that the parents or guardians may excuse their children from some or all of the comprehensive health education program, [*id.* at ¶ 134].  The Lees and the Juriches were not given notice of the GSA's activities, agenda, or materials.  [*Id.* at ¶¶ 76, 109].  Plaintiffs allege that they "have strong and sincere religious convictions regarding the education of their children" about gender identity and sexual orientation and that, had they been provided notice of the topics discussed at GSA meetings, "they would have elected to opt their child out based on these deeply held religious beliefs."  [*Id.* at ¶¶ 124–26].

Additionally, Mr. and Ms. Lee's son, M.L., was a seven-year-old first grader at RES in May 2021.  [*Id.* at ¶¶ 16, 78].  The Lees learned that the District offers gender support plans[3] that "prohibit harassment based on gender identities or gender expressions" and that "oblige [District] personnel to use the elected pronouns and names identified" in a plan when speaking with or about the child who is the subject of the plan.  [*Id.* at ¶¶ 79, 81].  The Lees completed gender support forms for M.L. on three separate occasions, requesting that District personnel refer to M.L. by his biological sex and birth name.  [*Id.* at ¶¶ 85, 178].  The District "informed the Lees that gender support plans exist only to benefit and protect the gender identities of transgender children, whereas the Lees sought a gender support plan binding the [District] to benefit and protect the gender identity of their son, including his name and masculine pronouns."  [*Id.* at ¶ 86].  Plaintiffs allege that "an Individual Gender Support Form is not available to a biological male student who identifies as male nor a biological female student who identifies as . . . female" due to "the conjunction of the biological sex and gender identity of the student."  [*Id.* at ¶¶ 177, 180].  H.J., C.L., and M.L. no longer attend District schools.  [*Id.* at ¶¶ 15–16, 20].

Plaintiffs initiated this lawsuit on May 3, 2023, asserting two claims against Defendants:  (1) a Fourteenth Amendment substantive due process claim alleging a "[d]enial of [the] right of the Plaintiff Parents to direct the education and upbringing of the Plaintiff Children," asserted by all Plaintiffs against all Defendants ("Count I"), [*id.* at ¶¶ 205–22]; and (2) a Fourteenth Amendment equal protection claim based on the District's denial of a gender support plan for M.L., asserted against both Defendants by

---

[3] Plaintiffs also use the term "Individual Gender Support Forms" interchangeably with "gender support plans."  *See* [Doc. 1 at ¶¶ 167–80].

Mr. Lee, Ms. Lee, and M.L. ("Count II"), [*id.* at ¶¶ 223–31]. They request the following relief: (1) a permanent injunction requiring (a) that the District provide notice and opt-out rights if gender dysphoria, gender transitioning, or related topics are taught in the District, (b) that these topics only be taught by qualified and trained professionals, and (c) that all materials used in any such instruction be given to parents fourteen days in advance of any instruction; (2) compensatory damages, including the costs of private-school tuition, medical expenses, counseling fees, compensation for damage to Plaintiffs' reputation, transportation, and emotional anguish; and (3) punitive damages. [*Id.* at 30–31].

Defendants filed the instant Motion to Dismiss on July 7, 2023. [Doc. 29]. In the Motion, Defendants contend that Plaintiffs' claims should be dismissed in their entirety because (1) Plaintiffs do not have standing to assert their claims, such that the Court lacks jurisdiction over the claims under Rule 12(b)(1), [*id.* at 17–20]; and (2) Plaintiffs fail to state a claim upon which relief can be granted under Rule 12(b)(6), [*id.* at 4–13]. Defendants also contend that Plaintiffs fail to allege facts supporting a theory of municipal liability and assert that their request for punitive damages is non-viable. [*Id.* at 13–17]. And finally, they contend that the Board should be dismissed because Plaintiffs' claims against it are duplicative. [*Id.* at 13–14]. Plaintiffs responded in opposition to the Motion, *see* [Doc. 37], and Defendants have replied, *see* [Doc. 43]. The matter is thus ripe for disposition and the Court considers the Parties' arguments below.

## LEGAL STANDARDS

### I.     Rule 12(b)(1)

Rule 12(b)(1) permits a court to dismiss an action for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Dismissal under Rule 12(b)(1) is not a judgment

Addenda 007

on the merits of the plaintiff's claim.   Instead, it is a determination that the court lacks authority to adjudicate the matter."   *Creek Red Nation, LLC v. Jeffco Midget Football Ass'n, Inc.*, 175 F. Supp. 3d 1290, 1293 (D. Colo. 2016).   "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking."   *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1016 (10th Cir. 2013) (quotation omitted).   The burden of establishing jurisdiction rests with the party asserting jurisdiction.   *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017).

"The Supreme Court's standing jurisprudence contains two strands:   Article III standing, which enforces the Constitution's case-or-controversy requirement, and prudential standing[,] which embodies judicially self-imposed limits on the exercise of federal jurisdiction."   *Wilderness Soc'y v. Kane Cnty.*, 632 F.3d 1162, 1168 (10th Cir. 2011) (en banc) (citations, ellipses, and quotations omitted).   Under Article III of the United States Constitution, federal courts only have jurisdiction to hear certain "cases" and "controversies."   *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014).   Article III standing is a jurisdictional prerequisite to suit and requires "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'"   *Id.* at 157–58 (alterations in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).   "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)."   *TransUnion LLC v. Ramirez*, 594 U.S. ---, 141 S. Ct. 2190, 2208 (2021).

7

The elements of standing are not simply pleading requirements, but are instead "an indispensable part" of a plaintiff's case.  *Lujan*, 504 U.S. at 561.  For this reason, the elements "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Id.*  Thus, at the pleading stage, factual allegations of injury resulting from the defendant's conduct "may suffice."  *Id.*

## II.    Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a Rule 12(b)(6) motion, the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quotation omitted).  The plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible" (quotation omitted)).  The ultimate duty of the Court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed."  *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

Defendants contend that Plaintiffs' claims should be dismissed under Rule 12(b)(1) for lack of standing and under Rule 12(b)(6) for failure to state a claim.  *See* [Doc. 29 at 4–13, 17–20].  The Court addresses Defendants' arguments on a claim-by-claim basis, starting with Defendants' standing arguments before turning to the merits of each claim. *See United States v. Springer*, 875 F.3d 968, 973 (10th Cir. 2017) ("Jurisdiction is a threshold question that a federal court must address before reaching the merits." (quotation omitted)).

I.    **Substantive Due Process – Count I**

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  The Due Process Clause "includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'"  *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).  One of these protected rights is the right of parents "to make decisions concerning the care, custody, and control of their children." *Id.* at 66.  This protection includes a parent's right to direct a child's education.  *Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998). However, this due process right is "limited in scope" and does not permit a parent "to control each and every aspect of their children's education and oust the state's authority over that subject."  *Id.*

Addenda 010

A.    **Standing**

Defendants first challenge Plaintiffs' standing to bring their substantive due process claim, which is brought by all Plaintiffs against Defendants. *See* [Doc. 1 at 27]. Defendants contend that Plaintiffs have failed to allege facts establishing any of the three required standing elements: injury in fact, causation, and redressability. [Doc. 29 at 17–20]. The Court addresses each element in turn.

*Injury in Fact.* "Article III requires more than a desire to vindicate value interests." *Diamond v. Charles*, 476 U.S. 54, 66 (1986). Article III's standing requirements help distinguish between "a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *Id.* at 66–67 (quoting *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 689 n.14 (1973)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). An injury is particularized if it affects the plaintiff "in a personal and individual way," and it is concrete if it is a real, non-abstract injury. *Id.* at 339–40 (quoting *Lujan*, 504 U.S. at 560 n.1).

Defendants argue that Plaintiffs fail to allege facts showing any concrete harm or direct injury to Plaintiffs. [Doc. 29 at 17]. According to Defendants, Plaintiffs' allegations are nothing more than conclusory assertions that fail to establish any concrete harm or direct injury to the Lees, the Juriches, or their children. [*Id.* at 17–18]. Plaintiffs respond that they "allege substantive due process injuries of 'private school tuition, medical expenses, counseling fees, compensation for damages to the Plaintiffs' reputation,

transportation, and emotional anguish' as a result of the violation of their substantive due process rights."  [Doc. 37 at 16 (quoting Doc. 1 at 30)].

The requests listed by Plaintiffs in their prayer for relief are not allegations demonstrating an "invasion of a legally protected interest," *Lujan*, 504 U.S. at 560, but are instead simply the categories of damages sought by Plaintiffs, *see* [Doc. 1 at 30 (Plaintiffs requesting "[c]ompensatory damages . . . including . . . private school tuition, medical expenses, counseling fees, compensation for damage to the Plaintiffs' reputation, transportation, and emotional anguish")].  However, the Court nevertheless finds that the parent Plaintiffs have adequately alleged an injury in fact for purposes of their substantive due process claim.  The Lees and the Juriches allege that they have "strong and sincere religious convictions" about educating their children on the topics of gender identity and sexual orientation.  [Doc. 1 at ¶¶ 124–25].  They allege that Defendants improperly taught "sexually themed matters" to their children without notice or the opportunity to opt out, [*id.* at ¶ 209], and that had they had notice of the topics discussed at GSA meetings, they would have "elected to opt their child out," [*id.* at ¶ 126].  Plaintiffs assert that Defendants' actions interfered with Plaintiffs' "ability to make decisions . . . directly related to their children's care and education," [*id.* at ¶ 219], and violated Plaintiffs' "fundamental right to make decisions regarding the upbringing, education, custody, care, and control of their children," [*id.* at ¶ 209].  The Court concludes that these allegations are sufficient, at the pleading stage, to adequately allege an injury in fact experienced by the Lees and the Juriches.  *See Doe v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 3:22-cv-00337-MJN-PBS, 2023 WL 5018511, at *11 (S.D. Ohio Aug. 7, 2023) (finding similar allegations sufficient to establish parents' standing), *appeal docketed*, No. 23-3740 (6th Cir. Sept. 8, 2023).

However, the Court cannot say the same with respect to H.J., C.L., or M.L. Although this specific argument was not raised by Defendants, *see generally* [Doc. 29], Article III standing is a jurisdictional requirement and the Court must satisfy itself that a case or controversy exists with respect to each claim, even if it requires sua sponte action. *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 942 (10th Cir. 2003).

Count I is a substantive due process claim based solely on an alleged violation of the Fourteenth Amendment *parental* right to direct the education and upbringing of one's children. *See* [Doc. 1 at 27 ("COUNT I – Violation of *Parental* Rights Under the Fourteenth Amendment"; "Denial of [the] right *of the Plaintiff Parents* to direct the education and upbringing of the Plaintiff Children" (emphasis added))]. It is axiomatic that the Fourteenth Amendment right to direct the care, custody, and control of one's children belongs to *parents*, not their children. *See Troxel*, 530 U.S. at 65 ("The liberty interest at issue in this case—*the interest of parents* in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." (emphasis added)); *see also id.* at 66 (explaining that the Supreme Court has "recognized the fundamental right *of parents* to make decisions concerning the care, custody, and control of their children" (emphasis added) (collecting cases)). In Count I, H.J., C.L., and M.L. do not allege that they themselves have minor children and a resulting fundamental Fourteenth Amendment due process right, *see generally* [Doc. 1], nor do they appear to claim a Fourteenth Amendment right to direct their *own* upbringing, *see, e.g.*, [*id.* at ¶ 219 (alleging a violation of "Plaintiffs' fundamental *parental* rights" (emphasis added))]. A "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties," *Warth v. Seldin*, 422 U.S. 490, 499

(1975), and the Court has located no authority that would permit a minor child to claim a parental due process right under the Fourteenth Amendment.

If there is no identified constitutional right, there can be no violation of that right or standing to assert a claim alleging a violation of that right. *See, e.g.*, *Black Lives Matter-Stockton Chapter v. San Joaquin Cnty. Sheriff's Off.*, 398 F. Supp. 3d 660, 674 (E.D. Cal. 2019) (plaintiffs lacked standing to assert a violation of a constitutional right they did not possess); *Batista v. City of Perth Amboy*, No. 2:15-cv-02833-KM-MAH, 2020 WL 1329980, at *9 n.8 (D.N.J. Mar. 23, 2020) (same); *cf. Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, No. 23-cv-00069-SWS, --- F. Supp. 3d. ---, 2023 WL 4297186, at *7 (D. Wyo. June 30, 2023) (finding it "unlikely" that stepparent had standing to assert a Fourteenth Amendment claim based on care, custody, and control of stepchild with whom he had no legal relationship). Because H.J., C.L., and M.L. do not identify a viable constitutional right that they actually possess with respect to Count I, they cannot allege a personal, particularized "invasion of a legally protected interest" for purposes of establishing an injury in fact. *Spokeo*, 578 U.S. at 339 (quotation omitted). Accordingly, the Court concludes that H.J., C.L., and M.L. do not have standing with respect to Count I. Count I is **DISMISSED without prejudice** to the extent it is asserted by these Plaintiffs. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) (dismissal for lack of standing must be without prejudice). The Court limits its remaining analysis on Count I to the Lees and the Juriches.

*Causation.* Next, Defendants contend that any injury suffered by the Lees and the Juriches cannot be traced to the conduct of the Defendants. "The requisite causal connection between the injury and the conduct complained of requires the injury be 'fairly

traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Willey*, 2023 WL 4297186, at *7 (quoting *Lujan*, 504 U.S. at 560). Defendants argue that causation is lacking because some of the claimed injuries—namely, private school tuition and transportation costs for C.L.—are "self-inflicted due to [the Lees'] decision to disenroll C.L. from WMS and enroll her in a private school." [Doc. 29 at 18]. They also argue that the parent Plaintiffs cannot demonstrate that Defendants' conduct was the impetus for C.L.'s and H.J.'s emotional decline because "the Complaint shows that it was parental non-acceptance and enforcement of their own traditional gender beliefs that caused C.L. and H.J.'s emotional decline." [*Id.* at 19 (footnote omitted)].

Accepting Defendants' arguments would require the Court to construe allegations in Defendants' favor, draw inferences in Defendants' favor, and find facts in Defendants' favor, all of which this Court cannot do. *Casanova*, 595 F.3d at 1124. In any event, as explained above, the injury underlying Count I is the alleged violation of the parent Plaintiffs' Fourteenth Amendment right to direct the care, custody, and control of their children—not the various types of damages claimed in the Complaint. And the parent Plaintiffs have adequately tied their alleged injury to the Defendants' conduct: they allege that Defendants taught "sexually themed matters" to their children in a way that contravenes the parent Plaintiffs' preferences, without notice to the parents and without permitting the parents to opt their children out of these discussions; that these actions interfered with their ability to make decisions related to their children's care and education; and that they would have made different choices had they been given notice and the option to opt-out. [Doc. 1 at ¶¶ 125–26, 191–95, 209, 219]. These allegations are

Addenda 015

sufficient at the pleading stage to establish the causation element of standing. *See Doe*, 2023 WL 5018511, at *11.

*Redressability.*  Finally, Defendants challenge Plaintiffs' standing with respect to their request for injunctive relief, which relates only to Count I. *See* [Doc. 1 at 30 (Plaintiffs requesting a permanent injunction ordering the District to provide notice and opt-out rights if certain subjects will be taught in school, that these topics only be taught by qualified individuals, and that parents receive materials in advance of instruction)].  Defendants argue that Plaintiffs' request for injunctive relief would not be redressable by a judicial decision because Plaintiffs "do not plausibly allege any injury in fact or any immediate danger of sustaining a direct injury much less any continuing injury to establish any entitlement to injunctive relief as a matter of law." [Doc. 29 at 20 n.14].[4]  Plaintiffs respond that they "will continue to sustain injuries if they reenroll their students in the Defendants' public schools," adding that their "current educational plans for their children are much less convenient and much more costly" than attending District schools.  [Doc. 37 at 18–19].

The purpose of injunctive relief is to prevent future violations of the law, *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953), and thus, a plaintiff cannot maintain a request for injunctive relief "unless he or she can demonstrate a good chance of being likewise injured in the future," *Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991).  In

---

[4] Defendants also argue that Plaintiffs cannot demonstrate redressability because "the [District's] Guidelines follow both state law and District policies, all of which would still be in effect regardless of any court decision pertaining to the GSA meetings or Guidelines." [Doc. 29 at 20].  However, all references to the District's Guidelines in the Complaint are in the context of Count II, not Count I.  *See, e.g.*, [Doc. 1 at ¶¶ 148–56, 170–81, 223–31]. The Court thus addresses this argument in the context of Count II.

15

requesting equitable relief, the plaintiff must "demonstrate 'an adequate basis for equitable relief'—that is, '[a] likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law.'"  *Jordan v. Sosa*, 654 F.3d 1012, 1024 (10th Cir. 2011) (alteration in original) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 499, 502 (1974)).  The plaintiff's continued susceptibility to injury "must be reasonably certain," and speculation or conjecture are insufficient.  *Id.*

Plaintiffs allege that H.J., C.L., and M.L. are "former student[s]" of District schools, [Doc. 1 at ¶¶ 15–16, 20], though they only affirmatively allege that C.L. was disenrolled from her former school, [*id.* at ¶ 69].  Importantly, the Complaint contains no allegations that the student Plaintiffs are currently enrolled in District schools, that the parent Plaintiffs intend to or desire to reenroll their children in District schools, or that they have other children attending District schools.  *See generally* [*id.*].  Indeed, the Stipulated Facts in the Scheduling Order omit any assertion that H.J., C.L., or M.L. attend District schools as of the filing of this action.  [Doc. 27 at 4–6].  Although the parent Plaintiffs assert in their Response that they will continue to suffer injuries if they reenroll their children in District schools and suggest that they may benefit economically from doing so, [Doc. 37 at 18–19], it is well-established that a plaintiff cannot amend a pleading by including new facts in a response brief, *see Abdulina v. Eberl's Temp. Servs., Inc.*, 79 F. Supp. 3d 1201, 1206 (D. Colo. 2015).  Further, the parent Plaintiffs identify no present plans—in the Complaint or otherwise—to reenroll their respective children in District schools.

Because the Complaint alleges that H.J., C.L., and M.L. are no longer enrolled in District schools, and because Plaintiffs allege no present plans to reenroll the students in District schools, Plaintiffs' continued susceptibility to injury is not "reasonably certain."

*Jordan*, 654 F.3d at 1024.  The Court thus concludes that Plaintiffs lack standing to seek

the prospective injunctive relief requested in the Complaint.  *See Cash v. Lees-McRae*

*Coll., Inc.*, No. 1:18-cv-00052-MR-WCM, 2018 WL 7297876, at *11 (W.D.N.C. Aug. 13,

2018) (finding that injunctive relief would not redress former student's alleged injuries

where she had withdrawn from the defendant college and did not allege a present

intention to reenroll), *report and recommendation adopted*, 2019 WL 276842 (W.D.N.C.

Jan. 22, 2019), *aff'd*, 811 F. App'x 190 (4th Cir. 2020); *Hole v. Tex. A&M Univ.*, No. 1:04-

cv-00175, 2009 WL 8173385, at *6 (S.D. Tex. Feb. 10, 2009) ("Plaintiffs' graduation,

coupled with the fact that they are not now enrolled, or have even sought to re-enroll at

the University indicates no ongoing harm, and thus, prevents the Court from providing

any *prospective* remedy as to them." (emphasis in original)), *aff'd*, 360 F. App'x 571 (5th

Cir. 2010).  Count I is therefore **DISMISSED without prejudice** to the extent it seeks

prospective injunctive relief.  Having decided that the parent Plaintiffs have standing to

assert their Fourteenth Amendment claim to the extent they seek monetary damages, the

Court turns to the Parties' substantive merits arguments.

###    B.    The Sufficiency of Plaintiffs' Allegations

"[T]he touchstone of due process is protection of the individual against arbitrary

action of government."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998)

(quotation omitted).  In addition to guaranteeing fair procedures, the Due Process Clause

of the Fourteenth Amendment "cover[s] a substantive sphere as well, barring certain

government actions regardless of the fairness of the procedures used to implement

them."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1181 (10th Cir. 2009) (alteration

in original) (quoting *Lewis*, 523 U.S. at 840).  "[T]he Supreme Court recognizes two types

Addenda 018

of substantive due process claims:  (1) claims that the government has infringed a 'fundamental' right, . . . and (2) claims that government action deprived a person of life, liberty, or property in a manner so arbitrary it shocks the judicial conscience."  *Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019) (citing *Glucksberg*, 521 U.S. at 721–22, and *Lewis*, 523 U.S. at 846).

In the Tenth Circuit, courts generally "apply the fundamental-rights approach when the plaintiff challenges legislative action, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious executive action."  *Halley v. Huckaby*, 902 F.3d 1136, 1153 (10th Cir. 2018) (emphasis omitted).  However, courts will also employ the fundamental-rights approach if "the plaintiff challenges 'the concerted action of several [government] employees, undertaken pursuant to broad government policies,' which is 'akin to a challenge to legislative action.'"  *Maehr v. U.S. Dep't of State*, 5 F.4th 1100, 1117 (10th Cir. 2021) (quoting *Abdi v. Wray*, 942 F.3d 1019, 1027 (10th Cir. 2019)).  Here, both Parties appear to use the fundamental-rights test without analyzing whether it is the appropriate test for Plaintiffs' claim.  *See* [Doc. 29 at 4–9; Doc. 37 at 4–10].  Because neither Party argues that the conscience-shocking approach applies here, and because Plaintiffs appear to challenge broadly the conduct of several District employees, allegedly undertaken pursuant to official and unofficial District policies, as opposed to the specific conduct of one government actor, *see ETP Rio Rancho Park, LLC v. Grisham*, 522 F. Supp. 3d 966, 1029 (D.N.M. 2021) ("An 'executive action' in the substantive due process analysis context is typically a 'specific act of a governmental officer.'" (quoting *Lewis*, 523 U.S. at 846)), the Court will consider the Parties' arguments under the fundamental-rights approach, *cf. Hernandez v. Grisham*, 508 F. Supp. 3d 893, 982 (D.N.M. 2020) (applying

Addenda 019

the fundamental-rights test to challenge to a school district's official guidance), *aff'd in part, appeal dismissed in part*, No. 20-2176, 2022 WL 16941735 (10th Cir. Nov. 15, 2022).

The Court analyzes a substantive due process claim using three steps.  First, the Court determines whether a fundamental right is at stake.  *Abdi*, 942 F.3d at 1028. Second, the Court must decide whether the claimed right has been infringed "through either total prohibition or direct and substantial interference."  *Id.* (quotation and alteration marks omitted).  And third, if the right allegedly violated is fundamental, the Court must determine whether the challenged government action is narrowly tailored to achieve a compelling government purpose—or, if the right at issue is not a fundamental right, whether it is rationally related to a legitimate government end.  *Id.*; *see also United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002) (explaining rational basis review).  With this framework, this Court now turns to considering whether Plaintiffs have sufficiently alleged a viable cause of action.

Plaintiffs allege a violation of their fundamental right to make decisions about the care, custody, and control of their children.  *See, e.g.*, [Doc. 1 at ¶¶ 122, 206, 209, 219]. Defendants argue that Plaintiffs fail to allege a violation of that right because while parents have a right to direct the care, custody, and control of their children, they have no constitutional right to control each and every aspect of their child's education.  [Doc. 29 at 4–6].  They contend that the right does not extend to the curriculum or extracurricular activities offered by the school.  [*Id.* at 6].  In response, Plaintiffs insist that Defendants' actions have violated their right "to direct the upbringing of their children" by "surreptitiously inserting themselves into the private realm of the family" and "[keeping] parents uninformed about sexually explicit topics taught at school-sponsored clubs and

19

discourag[ing] children from discussing issues related to gender and sexuality with their parents."  [Doc. 37 at 4–5].

The right of parents to direct the care, custody, and control of their children "is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court, *Troxel*, 530 U.S. at 65, and encompasses the constitutional right to direct their children's education, "up to a point," *Swanson*, 135 F.3d at 699.  This right can be traced back to *Meyer v. Nebraska*, 262 U.S. 390 (1923), and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925).  In *Meyer*, the Supreme Court held that a law requiring that school lessons be in English was unconstitutional because it infringed on parents' due process rights to direct the education of their children.  262 U.S. at 399–401.  And in *Pierce*, the Supreme Court held that a law which required public-school attendance for children ages eight to sixteen also "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control."  268 U.S. at 534–35.  *Meyer* and *Pierce* "evince the principle that the state cannot prevent parents from choosing a specific educational program—whether it be religious instruction at a private school or instruction in a foreign language," and cannot otherwise "completely foreclos[e] the opportunity of individuals and groups to choose a different path of education."  *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 533 (1st Cir. 1995), *abrogated in part on other grounds by DePoutot v. Raffaelly*, 424 F.3d 112, 118 n.4 (1st Cir. 2005).

But the Supreme Court has stressed the "limited scope" of this authority.  *Norwood v. Harrison*, 413 U.S. 455, 461 (1973); *see also, e.g.*, *Pierce*, 268 U.S. at 534 ("No question is raised concerning the power of the state reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children

20

of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare."); *Meyer*, 262 U.S. at 402 (recognizing the state's right to "compel attendance at some school," "make reasonable regulations for all schools," and "prescribe a curriculum for institutions which it supports").  Indeed, the Tenth Circuit (like other circuits) recognizes that this right only extends so far.  *See, e.g.*, *Swanson*, 135 F.3d at 699 (explaining that the right is "limited in scope" and that "parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject"); *see also Leebaert v. Harrington*, 332 F.3d 134, 141 (2d Cir. 2003) ("*Meyer*, *Pierce*, and their progeny do not begin to suggest the existence of a fundamental right of every parent to tell a public school what his or her child will and will not be taught."); *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1207 (9th Cir. 2005) (holding that the parental right to direct the care, custody, and control of children "does not extend beyond the threshold of the school door").  The Sixth Circuit has described the limits of the right as follows:

> While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child.  Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or, as here, a dress code, these issues of public education are generally "committed to the control of state and local authorities."

*Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395–96 (6th Cir. 2005) (emphasis in original) (quoting *Goss v. Lopez*, 419 U.S. 565, 578 (1975)).  "These decisions make clear

21

that a parent has the right to control where their child goes to school.  But that is where their control ends."  *Doe*, 2023 WL 5018511, at *13.

Plaintiffs assert that their Fourteenth Amendment parental rights were violated when District personnel allegedly taught H.J. and C.L. about sexual orientation and/or gender identity without providing the parents with notice or the opportunity to opt their children out of GSA meetings.  [Doc. 1 at ¶ 209].  However, Plaintiffs direct the Court to no authority demonstrating that the Fourteenth Amendment confers a *constitutional right* to receive notice about topics discussed in the District's curriculum, and particularly, at after-school, voluntary extracurricular clubs that they may find objectionable, or the right to excuse their children from those discussions.  *See generally* [Doc. 37].  In fact, the weight of authority demonstrates that the Fourteenth Amendment right does not extend so far.  *See, e.g.*, *Leebaert*, 332 F.3d at 140–42 (parent had no fundamental right to demand that child be excluded from health education classes); *Parker v. Hurley*, 514 F.3d 87, 102 (1st Cir. 2008) (holding that there is no constitutional right that "permit[s] parents to demand an exemption for their children from exposure to certain books used in public schools"); *Fields*, 427 F.3d at 1206 (parents "have no constitutional right . . . to prevent a public school from providing its students with whatever information it wishes to provide, sexual or otherwise, when and as the school determines that it is appropriate to do so").

Recent district court decisions involving factual allegations similar to those asserted here hold similarly.  For example, in *Doe*, the plaintiff parents alleged that the defendant school district violated their constitutional rights by (1) permitting transgender students to use the bathroom that corresponds with their gender identity and (2) refusing to answer the parents' questions about the district's bathroom policies.  *See* 2023 WL

22

5018511, at *6.  The court concluded that the parents failed to allege a plausible Fourteenth Amendment violation on either basis.  *Id.* at *13–14.  Noting the limited nature of the parents' Fourteenth Amendment right, the court determined that implementing new bathroom policies was "for the school to decide" and did not "in any way" implicate the rights recognized in earlier Supreme Court cases—e.g., the right to send students to a particular private school, the right to instruct children in certain subjects or to homeschool them, or parents' right to decide where their children receive an education.  *Id.* at *13 (citing *Meyer*, 262 U.S. at 401–03; *Runyon v. McCrary*, 427 U.S. 160, 177 (1976); and *Wisconsin v. Yoder*, 406 U.S. 205, 231–33 (1972)).  Furthermore, even more relevant here, the Court found that the parents' objections to the district's alleged refusal to answer their questions about the bathroom policies "[did] not implicate a parent's fundamental right to control their children's upbringing," reasoning that "the Fourteenth Amendment does not confer parents with an unfettered right to access information about what their children are learning," to "interject in how a State school teaches children," or to receive an "answer [to] every demand made of them from frustrated parents (no matter how reasonable that frustration may be)."  *Id.* at *13–14.

In addition, this Court finds a recent Recommendation issued by a Magistrate Judge in this District persuasive and relevant to the analysis in this case.  *See Jones v. Boulder Valley Sch. Dist. RE-2*, No. 20-cv-03399-RM-NRN, 2021 WL 5264188 (D. Colo. Oct. 4, 2021).[5]  In that case, the parent plaintiffs alleged, inter alia, that their due process

---

[5] In *Jones*, the Honorable N. Reid Neureiter issued a Recommendation that the defendant school district's motion to dismiss be granted and the parent plaintiffs' motion to amend the complaint be denied.  *See* 2021 WL 5264188, at *22.  Before the *Jones* parties filed any objections to Judge Neureiter's Recommendation, and before the Honorable Raymond P. Moore could rule on the Recommendation, the *Jones* parties settled the

rights were violated when the school district planned a performance by a transgender choir with accompanying videos and classroom discussion on transgender issues. *Jones*, 2021 WL 5264188, at *2.  While parents were given the option to opt their children out of the musical performance, they were not given this option for the videos or classroom lessons.  *Id.* at *4.  The plaintiff parents kept their children home from school on the day of the performance and discussion and subsequently requested that if any similar topics arose in the future in the classroom, that their children "immediately be removed from the classroom (even before a teacher responds to a child's question), sent to the office, and [that the parents be] notified immediately"; the school district declined to opt-out the students from certain topics prospectively.  *Id.* at *5.  The court concluded that the plaintiffs had failed to allege a plausible violation of their Fourteenth Amendment due process rights, stating:

> The Parents' primary complaint is that the School, without notice, is attempting to "indoctrinate" their children about LGBTQ-affirming and transgender-affirming principles, in conflict with the Family's religious beliefs.  Despite the use of the loaded term "indoctrinate," reading the Amended Complaint liberally, it is the mere exposure to ideas or principles that allegedly conflict with their beliefs to which they are objecting.  *And the Parents cite no federal case under the Due Process Clause which has permitted public school parents to demand an exemption for their children from mere exposure to certain concepts or ideas.*

*Id.* at *15 (emphasis added).  The court found that "[d]ecisions as to what curriculum a public school decides to offer or require are uniquely committed to the discretion of local school authorities," *id.* at *16, relying on, inter alia, *Fields*, which similarly held that a parent has no constitutional right to "prevent a public school from providing its students

---

case.  *See Jones v. Boulder Valley Sch. Dist. RE-2*, No. 20-cv-03399-RM-NRN, ECF No. 79 (D. Colo. Nov. 15, 2021).

Addenda 025

with whatever information it wishes to provide, . . . when and as the school determines that it is appropriate to do so," *Fields*, 427 F.3d at 1206.

Plaintiffs do not discuss any of this case law and do not identify any authority demonstrating that parents' fundamental Fourteenth Amendment rights are violated if they are deprived of the opportunity to direct what their children learn in schools, receive notice of what students are learning in schools, or exempt their children from certain lessons or topics. *See* [Doc. 37 at 4–10]. Instead, they direct the Court to the Supreme Court's decision in *Troxel*, as well as two recent district-court decisions from other courts in the Tenth Circuit: *Ricard v. USD 475 Geary County, Kansas School Board*, No. 5:22-cv-04015-HLT-GEB, 2022 WL 1471372 (D. Kan. May 9, 2022), and *Willey*. *See* [Doc. 37 at 5–7].

Plaintiffs first contend that "[w]hen examined through the lens of *Troxel* the unlawful nature of Defendants' policy is clear." [*Id.* at 5]. Plaintiffs seem to read *Troxel* to hold that school districts must always defer to parents' preferences about what their children can and cannot be taught in schools, so long as there has been no determination that the parents are "unfit." *See* [*id.* at 5–6 ("[T]here has been no suggestion that any Lee or Jurich parent [is] unfit. Accordingly, the Defendants were compelled to presume that the Lees and Juriches possess the maturity and experience their children lack and that their natural bonds of affection will lead the parents to act in the best interests of their children." (quotation and alteration marks omitted))]. But *Troxel* does not stand for this broad proposition. *Troxel* concerned parental visitation rights; it did not discuss a right of parents to direct the policies of or lessons taught in public schools or a right to receive notice about topics planned for discussion. *See Troxel*, 530 U.S. at 67–73; *see also*

*Parents for Priv. v. Barr*, 949 F.3d 1210, 1230 (9th Cir. 2020) (discussing the nature and scope of the *Troxel* opinion). "[T]here is *nothing* in Troxel that would lead [a court] to conclude . . . that parents have a *fundamental* right to the upbringing and education of the child that includes the right to tell public schools what to teach or what not to teach him or her." *Leebaert*, 332 F.3d at 142 (first emphasis added). In contrast, numerous circuit courts have held, even post-*Troxel*, that parents have no fundamental constitutional right to exercise such control over a school's curriculum or extracurricular activities. *See id.*; *Parker*, 514 F.3d at 102; *Fields*, 427 F.3d at 1206.

The district court cases cited by Plaintiffs are similarly unhelpful. *Ricard* involved a teacher's challenge to school district policies that required her to refer to students using their preferred first name and pronouns. *See* 2022 WL 1471372, at *1. *Ricard* is a First Amendment free exercise case, not a Fourteenth Amendment parental rights case, *see id.* at *4, and despite its brief discussion of parental constitutional rights, *see id.* at *8, it is not analogous to this case. Meanwhile, *Willey* involved a challenge to a school district policy that prohibited, or could be read to prohibit, school district personnel from answering parents' questions about their children's use of pronouns at school. *See* 2023 WL 4297186, at *3, *15. In ruling that the parent plaintiffs had established a likelihood of success on the merits for purposes of obtaining preliminary injunctive relief, the *Willey* court concluded that the policy might burden a parent's right to direct the upbringing of their child "if a parent was misinformed or the District or a teacher refused to respond to a parent's inquiry regarding their minor child's request to be called by a different name, absent a showing of some danger to the health or wellbeing of the student." *Id.* at *13–14. In so doing, it specifically highlighted the denial of information *after parental inquiry*:

26

> To the extent the Student Privacy Policy prohibits a teacher or school employee, *upon inquiry* by a parent or legal guardian, from responding or providing accurate and complete information concerning their minor child (and absent a threat to the wellbeing of the student), it burdens a parent's fundament right to make decisions concerning the care, custody and education of their child.

*Id.* at *14 (emphasis in original).  The *Willey* court reasoned that parents could not make an informed decision as to how to exercise their parental rights to choose the site of their child's education—private school, public school, or home schooling—if "they [we]re unaware of circumstances that have a significant bearing on that decision because of the school's withholding of information or active deception, despite their inquiry."  *Id.*

*Willey* is factually distinguishable from this case.  Although the Complaint contains allegations concerning a District policy governing the disclosure of students' transgender status or pronouns used at school to parents, *see* [Doc. 1 at ¶¶ 148–65], Count I is not based on this policy, *see* [*id.* at ¶¶ 205–22].  Indeed, the Complaint contains no allegations that the Lees or the Juriches asked District personnel for information concerning their children's transgender status or use of pronouns at school and were denied information. *See generally* [*id.*].  Nor does the Complaint raise any claim based on this policy, *see* [*id.* at ¶¶ 205–31], assert any injury based on this policy, or seek any relief with respect to this policy, *see* [*id.* at 30–31].  The Court remains persuaded by the case law discussed above holding that parents have no constitutional right to exercise control over a school's curriculum or extracurricular activities or to demand information about the same.

Finally, Plaintiffs assert that "Defendants' concealment efforts also run afoul of Colorado law" because "Colorado parents have statutory rights to be notified of educational materials that contemplate sexually explicit content and require parents to be afforded a meaningful opt-out provision."  [Doc. 37 at 8 (citing Colo. Rev. Stat. §§ 22-1-

Addenda 028

128(3)(b), 22-25-110(4)(a))].  But a state-law requirement that school districts provide certain information to parents does not create a *constitutional* right to receive that information.  *See Parents for Priv.*, 949 F.3d at 1232 ("Although state and federal statutes may expand upon constitutional protections by creating new statutory rights, statutes do not alter the protections afforded by the Constitution itself."); *Jones*, 2021 WL 5264188, at *11 ("A failure by the District or the School's principal to strictly adhere to a Colorado's notice and opt out requirements does not necessarily a federal constitutional claim make.").  The Complaint, which asserts only federal claims, contains no allegations that Defendants' conduct violates state law, *see generally* [Doc. 1], nor do Plaintiffs assert that Defendants have deprived them of a protected property interest conferred by statute, *see generally* [*id.* at ¶¶ 205–22]; *see also Carnes v. Parker*, 922 F.2d 1506, 1509 (10th Cir. 1991) (explaining that property rights protected by the Due Process Clause are "created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract").

In sum, while the parent Plaintiffs generally have a Fourteenth Amendment fundamental right to direct the upbringing of their children, they have not adequately alleged a violation of that fundamental right.  As a result, the Court need not, and does not, analyze whether Defendants' conduct passes any particular level of scrutiny.  *See Abdi*, 942 F.3d at 1028.[6]  The Motion to Dismiss is respectfully **GRANTED** with respect

---

[6] It is not entirely clear to the Court whether it must conduct a rational basis review even though it has concluded that the parent Plaintiffs have not alleged a violation of their fundamental right to direct the upbringing of their children.  *Compare Abdi*, 942 F.3d at 1028, *with Dias*, 567 F.3d at 1182 ("Even if the Ordinance does not implicate a fundamental right, it must nonetheless bear a rational relationship to a legitimate government interest.").  Even if the Court did proceed to a rational basis review, the end result would not change.  Government action satisfies the rational basis standard if "if

Addenda 029

to Count I.  Count I is **DISMISSED without prejudice** for failure to state a claim under

Rule 12(b)(6).[7]

## II.    Equal Protection – Count II

As a preliminary matter, the Court pauses to ascertain the nature of Count II.

Count II is titled "COUNT II – Violation of Parental Rights Under the Fourteenth

Amendment."  [Doc. 1 at 29].  Its subheading asserts a "[d]enial of equal protection under

---

there is any reasonably conceivable state of facts that could provide a rational basis for the [infringement]."  *Maehr*, 5 F.4th at 1122 (alteration in original) (quoting *F.C.C. v. Beach Comm'cns, Inc.*, 508 U.S. 307, 313 (1993)).  "This requires 'no more than a 'reasonable fit' between governmental purpose . . . and the means chosen to advance that purpose.'" *Id.* (alteration in original) (quoting *Reno v. Flores*, 507 U.S. 292, 305 (1993)).  In their Motion, Defendants argue that the District "has a legitimate interest in providing a safe and supportive environment for all its students, including those who are transgender or gender nonconforming."  [Doc. 29 at 7].  They contend that their policies further that interest by "seek[ing] to reduce the stigmatization of, and improv[ing] the educational experiences and outcomes of, transgender and non-binary students while maintaining the privacy of all students and fostering cultural competence and professional development for school staff."  [*Id.* at 8].  The Court agrees with Defendants that they have identified a legitimate government purpose that is furthered by rational means.  *See Vesely v. Ill. Sch. Dist. 45*, No. 1:22-cv-02035, 2023 WL 2988833, at *5 (N.D. Ill. Apr. 18, 2023) (recognizing a legitimate government interest in "maintaining a non-discriminatory environment for students and protecting students' privacy, mental well-being, and physical safety"), *appeal dismissed*, No. 23-2190 (7th Cir. July 14, 2023).

[7] Defendants request that Count I be dismissed with prejudice.  [Doc. 29 at 9].  "A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile."  *Brereton*, 434 F.3d at 1219.  While Defendants cite to the *Jones* recommendation in support of their request, they make no substantive futility argument.  *See* [Doc. 29 at 9].  The Court declines to undertake a futility analysis sua sponte and instead will dismiss Count I without prejudice.  *But see Jones*, 2021 WL 5264188, at *21 (concluding that amendment of claim would be futile because "there is no federal constitutional right for public school parents or families to get advance notice of and the right to opt-out of religiously offensive material"); *Parents for Priv.*, 949 F.3d at 1233 (affirming dismissal of Fourteenth Amendment claim with prejudice because "Supreme Court and Ninth Circuit case law . . . ha[d] not recognized the specific rights asserted by Plaintiffs" and "further foreclose[d] recognizing such rights as being encompassed by the fundamental parental rights protected by the Fourteenth Amendment's Due Process Clause").

the law by denial of a gender support plan to Plaintiff ML where other similarly situated students are granted gender support plans." [*Id.*].  The Complaint alleges that M.L. was "denied . . . the protection of the laws offered to other similarly situated children within the district and [was denied] his right to equal protection of the laws," [*id.* at ¶ 230], but also cursorily states that "[t]he Fourteenth Amendment to the United States Constitution provides that the right to direct and control the upbringing of children is the province of fit parents and that this right is fundamental," [*id.* at ¶ 231].  Count II does not plainly allege the violation of the Lees' parental rights under the Fourteenth Amendment.  *Compare* [*id.* at ¶¶ 224–31], *with* [*id.* at ¶ 209 (explicitly alleging that Defendants violated the parent Plaintiffs' Fourteenth Amendment rights in the context of Count I)].  Defendants too construed Count II as asserting only an equal protection claim, *see* [Doc. 29 at 9–13], and Plaintiffs did not take issue with this interpretation or try to correct it in their Response, *see* [Doc. 37].  Instead, in their Response, Plaintiffs direct their Fourteenth Amendment due process arguments strictly to Count I, *see* [Doc. 37 at 4–10], and with respect to Count II, they raise arguments only under the Equal Protection Clause, *see* [*id.* at 10–13].[8]

_____

[8] Plaintiffs do briefly reference gender support plans in the context of arguing that "Defendants' efforts at concealment were a feature, not a bug, of the Defendants' policies and practices," stating:  "[r]egarding the [gender support plans,] Defendants are again perfectly willing to exclude parents from the decision process and keep them ignorant of student decisions."  [Doc. 37 at 6–7 (citing Doc. 1 at ¶¶ 169–70)].  The cited paragraphs in the Complaint allege that gender support forms may be completed without parental consent and that District personnel are not obligated to inform parents if their child completes a gender support form.  [Doc. 1 at ¶¶ 169–70].  Notably, however, the Complaint does not allege that M.L. filled out a gender support form himself or that the District failed to notify the Lees of such; rather, the Complaint expressly alleges that it was the Lees who filled out a gender support form for M.L.  *See* [*id.* at ¶ 85].  The Court thus does not construe Plaintiffs' due process argument in the Response to be directed to Count II.

Addenda 031

The Court is neither obligated nor permitted to construct legal theories on behalf of parties that they do not advance themselves.  *See United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself."); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (observing that the court has no obligation to make arguments or perform research on behalf of litigants); *Carrillo v. New Mexico ex rel. Child., Youth & Fams. Dep't*, 405 F. Supp. 3d 1048, 1055 (D.N.M. 2019).  For the several reasons above, the Court assumes that the heading of Count II is a typographical error and that Count II does not assert a Fourteenth Amendment substantive due process claim.  The Court thus limits its analysis on Count II to the Equal Protection Clause.

### A.    Standing

With respect to Count II, Defendants contend that Plaintiffs fail to allege facts establishing Article III standing on the part of the Lees or M.L.  [Doc. 29 at 17–18].  Defendants' arguments related to Count II address only the first and third standing requirements—injury and redressability—and the Court's analysis is similarly limited.

*Injury in Fact.*  Defendants assert that the Lees and M.L. fail to identify an injury in fact supporting Count II because "the Complaint is devoid of any alleged harm arising from [the Lees'] request for a gender support plan reiterating [M.L.'s] biological gender and pronouns—i.e., his status quo remained the same and there is no other alleged injury to M.L. evident in the Complaint."  [*Id.* (emphasis omitted)].

For equal protection claims, the injury "is the denial of equal treatment resulting from the imposition of [a] barrier," *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993), i.e., the injury is the imposition of the

Addenda 032

barrier *itself*, *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 493 (10th Cir. 1998).
Here, Plaintiffs allege that the Lees requested a gender support plan for M.L., but their
request was denied based on "the conjunction of [M.L.'s] biological sex and gender
identity." [Doc. 1 at ¶¶ 83–88, 180]. While not robust, these allegations are sufficient to
plausibly allege an injury in fact at the pleading stage.

 ***Redressability.*** Next, Defendants argue that Plaintiffs fail to demonstrate that any
injury suffered as a result of Defendants' actions would be redressed by a favorable
judicial decision. They contend that the District's guidelines governing the provision of
gender support plans "follow both state law and District policies, all of which would still be
in effect regardless of any court decision pertaining to the GSA meetings or Guidelines."
[Doc. 29 at 20]. Plaintiffs respond that a "favorable decision would provide monetary
damages fully redressing Plaintiffs' injuries," but do not directly address Defendants'
argument. *See* [Doc. 37 at 18–19].

 The Court is respectfully unpersuaded by Defendants' argument, which lacks
meaningful development. First, the Court notes that Plaintiffs only requested injunctive
relief with respect to Count I, *see* [Doc. 1 at 30], and that request has been dismissed,
limiting the relief sought to monetary damages. Furthermore, if the Lees and M.L. are
correct on their legal theory that the District's policies and conduct violated M.L.'s
Fourteenth Amendment rights, their injury will be redressable by money damages
regardless of any state law or District guidelines. *Cf. Parents Defending Educ. v.
Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 2:23-cv-01595-ALM-KAJ, 2023 WL 4848509,
at *8 (S.D. Ohio July 28, 2023) ("Federal statutes must give way to the federal
Constitution; an unconstitutional action cannot stand simply because it is authorized by a

Addenda 033

federal law.  Thus, if the Policies violate the First or Fourteenth Amendments, then they must be enjoined even if the School District is compelled by Title IX to combat harassment on the basis of gender identity." (citation omitted)), *appeal docketed*, No. 23-3630 (6th Cir. July 31, 2023).  The Court is respectfully unpersuaded by Defendants' argument and finds that the Lees' and M.L.'s alleged injuries could be redressed by a favorable court decision.

### B.    The Sufficiency of Plaintiffs' Allegations

The Fourteenth Amendment states that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "The Equal Protection Clause does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  It does not create substantive rights, but instead "embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly."  *Vacco v. Quill*, 521 U.S. 793, 799 (1997).

"Different types of equal protection claims call for different forms of review.  A claim that a state actor discriminated on the basis of a suspect (e.g., race), quasi-suspect (e.g., gender), or a non-suspect classification calls for strict, intermediate, or rational basis scrutiny, respectively."  *Brown v. Montoya*, 662 F.3d 1152, 1172 (10th Cir. 2011).  In each instance, the plaintiff must make "a threshold showing that they were treated differently from others who were similarly situated to them."  *Id.* at 1173 (quotation omitted).  Individuals are "similarly situated" only if they are alike "in all relevant respects."  *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018) (quotation omitted).  "[A]lthough this is not a precise formula, it is nonetheless clear that similarly situated individuals must be

Addenda 034

very similar indeed." *Ebonie S. ex rel. Mary S. v. Pueblo Sch. Dist. 60*, 819 F. Supp. 2d 1179, 1189 (D. Colo. 2011) (quoting *United States v. Moore*, 543 F.3d 891, 896–97 (7th Cir. 2008)).

Defendants argue first that M.L.'s equal protection claim must be dismissed because Plaintiffs fail to allege that he was similarly situated to any students who allegedly received more favorable treatment. [Doc. 29 at 11]. In the alternative, they contend that rational basis review applies here and Defendants' conduct satisfies this standard. [*Id.* at 11–13].

### 1.    Similarly Situated

Defendants contend that M.L., whose parents sought a gender support plan to ensure the use of his birth name and male pronouns, is not identical in all relevant respects to District students who requested and received gender support plans, as those students are presumably transgender or gender non-confirming; instead, according to Defendants, M.L. is "identical in all relevant respects to other cisgender students who may request and would be denied gender support plans." [*Id.* at 11]. Plaintiffs respond that "[c]ontrary to the Defendants' suggestion, the similarly situated pertinent groups are not 'transgender' and 'cisgendered' [sic] but rather any child that experiences gender who seeks 'access to a school environment that is affirming and is free from discrimination and harassment on the basis of gender identity and gender expression.'" [Doc. 37 at 11]. But then, Plaintiffs immediately go on to assert that the denial of a gender support plan was "based on [M.L.'s] sex," that "the Guidelines, on their face, deny gender support plans to cisgender children while granting them to transgender children," and that the denial of

Addenda 035

a gender support plan to M.L. "was based on the fact that M.L.'s sex aligned with his preferred pronouns." [*Id.* at 11–12 (emphasis omitted)].

To the extent Plaintiffs suggest that M.L.'s and any unidentified comparator students' cisgender or transgender status is not relevant to the Court's analysis or to M.L.'s claim, this assertion is contradicted by Plaintiffs' own allegations in their Complaint. The Complaint does not clearly define the group of students to whom Plaintiffs believe M.L. is similarly situated; instead, Plaintiffs cursorily assert that M.L. was denied protections "that are available to other, similarly situated children." [Doc. 1 at ¶ 89]; *see also* [*id.* at ¶ 230]. The Complaint alleges that M.L. was denied a gender support plan, but that gender support plans are generally available to transgender students. [*Id.* at ¶¶ 86, 229]. And Plaintiffs consistently allege that the reason for the denial of a gender support plan for M.L. was the "conjunction of the biological sex and gender identity of the student," [*id.* at ¶¶ 180, 182], and suggest that transgender status is a relevant consideration in the grant or denial of a gender support plan, *see* [*id.* at ¶ 229 ("Children who are considered transgender and who desire a gender support plan may have one. Children who are not considered transgender but who nevertheless desire a gender support plan may not have one.")]; *see also* [Doc. 37 at 11–12]. Indeed, Plaintiffs allege that the District denied the Lees' request "on the basis that the parents could not use a plan to re-affirm M.L.'s given name and biological gender," as District policy provides that the District "cannot accommodate parent requests that the school staff use pronouns that align with a student's biology." [Doc. 1 at ¶¶ 227–28]. Thus, notwithstanding Plaintiffs' suggestion in their Response that the relevant question is whether M.L. was similarly situated to "any child that experiences gender" who seeks a safe and affirming

educational environment, the Court agrees with *both* sides that the relevant question in this case is whether M.L., a cisgender child who requested and was denied a gender support plan, is similarly situated to the students for whom a gender support plan is allegedly available, i.e., transgender or non-binary students.

Notably, Plaintiffs cite no legal authority demonstrating, and raise no argument asserting, that M.L. is similar in *all relevant* respects to those students for whom a gender support plan is available. *See* [Doc. 37 at 10–11]. Nor does the Complaint specifically identify the students to whom M.L. is similarly situated. *See generally* [Doc. 1]. "The absence of firm comparators renders Plaintiff[s'] claim nebulous at best," and ambiguous allegations are insufficient to support a plausible claim. *Oliver v. Va. Bd. of Bar Examiners*, 312 F. Supp. 3d 515, 534 (E.D. Va. 2018). "An equal protection claim will not lie by 'conflating all persons not injured into a preferred class receiving better treatment' than the plaintiff." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) (quoting *Joyce v. Mavromatis*, 783 F.2d 56, 57 (6th Cir. 1986)). While the Complaint loosely compares M.L. to a student who could receive a gender support plan, *see, e.g.*, [Doc. 1 at ¶¶ 86, 229], the allegations are unclear as to whether M.L. is alike in *all* relevant respects to those students. As alleged in the Complaint, the Lees requested a gender support plan for M.L. so District personnel would "refer to M.L. by his biological gender and birth name," and the District rejected the request on the basis that gender support plans are only available for transgender students. [*Id.* at ¶¶ 85–86]; *see also* [*id.* at ¶ 176 (alleging that a gender support plan is "intended to support a transgender or non-binary student in gaining access to a school environment that is affirming and is free from discrimination and harassment" (emphasis omitted))]. But the Court finds it highly

Addenda 037

relevant that the alleged purpose behind the Lees' request for a gender support plan for M.L.—to "affirm M.L.'s given name and biological gender," *see* [*id.* at ¶ 227]—is likely different from the reason a transgender or non-binary student would request a gender support plan. *Cf. Thompson v. Lengerich*, No. 22-1128, 2023 WL 2028961, at *2 (10th Cir. Feb. 16, 2023) (where plaintiff asserted an equal protection claim based on the denial of access to a private shower, while transgender inmates received access to a private shower, concluding that inmate was not similar to transgender inmates in all *relevant* respects because "[w]hether an inmate is transgender . . . is relevant to the inmate's need for a private shower because transgender . . . inmates may face an additional risk of assault"). However, the Court is mindful that, in other contexts, the Tenth Circuit has cautioned that whether individuals are similarly situated is typically a fact question reserved for the jury. *See, e.g.*, *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007). Accordingly, the Court will assume, without deciding, that Plaintiffs have adequately alleged that M.L. was similarly situated to other students who could receive a gender support plan and will turn to whether Plaintiffs' allegations plausibly allege a denial of equal protection.

## 2.     Rational Basis Scrutiny is Appropriate

Before deciding whether Defendants' alleged policy passes constitutional scrutiny, the Court must determine what level of scrutiny applies. "If the challenged government action implicates a fundamental right, or classifies individuals using a suspect classification, such as race or national origin, a court will review that challenged action applying strict scrutiny." *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109 (10th Cir. 2008). If the government action classifies individuals based on a "quasi-suspect

characteristic," such as gender, courts apply intermediate scrutiny. *Id.* Government conduct satisfies intermediate scrutiny if it serves "'important governmental objectives' and is 'substantially related to achievement of those objectives.'" *Id.* at 1110 (quoting *Concrete Works of Colo., Inc. v. City and Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003)). And finally, if the government action does not implicate a fundamental right, a suspect class, or a quasi-suspect class, rational basis scrutiny applies. *Id.* In this circumstance, the government classification requires only "a rational relation to some legitimate end." *Id.* (quotation omitted).

The Parties disagree about what level of scrutiny applies here. Plaintiffs contend that intermediate scrutiny applies because "Defendants' denial of M.L.'s [gender support plan] was based on his sex." [Doc. 37 at 11]. Defendants disagree, arguing that intermediate scrutiny does not apply because the provision of gender support plans does not create a gender classification between male and female students, but instead creates a classification between transgender or gender-non-confirming students and cisgender students. [Doc. 29 at 10–11]. Thus, Defendants contend, Defendants' policy should be reviewed for a rational basis. [*Id.* at 11–13].

The Court respectfully agrees with Defendants and disagrees with Plaintiffs. Plaintiffs attempt to frame this case as challenging a straightforward sex-based classification, asserting that the denial of the gender support plan "was based on sex discrimination." [Doc. 1 at ¶ 226]. However, this conclusory assertion is not plausible because it fails to account for the numerous allegations in the Complaint alleging that M.L. was denied a gender support plan due to the "conjunction of [M.L.'s] biological sex and gender identity" (i.e., M.L.'s cisgender status). *See, e.g.*, [*id.* at ¶¶ 86, 180–82,

227–29]; *see also* [*id.* at ¶ 226 ("[H]ad M.L. been a biological female, . . . [the District] would have granted M.L.'s gender support plan *for the use of male gender pronouns*." (emphasis added))].   The Complaint contains *no* allegations that a similarly situated female student who, *like M.L.*, requested a gender support plan to ensure the use of *female* pronouns was, or would have been, granted a gender support plan under the District's policies.   *See generally* [*id.*].   Indeed, Plaintiffs expressly allege that a gender support plan is "not available to a biological male student who identifies as male nor a biological female student who identifies as . . . female," [*id.* at ¶ 177 (emphasis added)], i.e., that a gender support plan is *equally* unavailable to both male and female students who seek to "affirm" their biological sex.   In other words, the Complaint plausibly alleges that M.L. was denied a gender support plan due to his cisgender or non-transgender status, but does not plausibly allege that he was denied a gender support plan solely due to his sex.   Plaintiffs' cursory legal conclusion that the denial of a gender support plan to M.L. "was based on sex discrimination" is thus not a well-pleaded factual allegation that the Court must take as true.   *See Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1303 (10th Cir. 2021) ("Courts do not assume as true allegations that are legal conclusions, formulaic recitations of elements, or naked assertions devoid of further factual enhancement."); *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (explaining that well-pled allegations are those that are "plausible, non-conclusory, and non-speculative").

The Supreme Court has only identified two classifications subject to intermediate scrutiny:  "sex and illegitimacy."  *Fowler v. Stitt*, No. 4:22-cv-00115-JWB-SH, --- F. Supp. 3d. ---, 2023 WL 4010694, at *19 (N.D. Okla. June 8, 2023) (citing *Reed v. Reed*, 404

Addenda 040

U.S. 71 (1971), and *Trimble v. Gordon*, 430 U.S. 762, 767 (1977)), *appeal docketed*, No. 23-5080 (10th Cir. July 7, 2023). "[T]he Supreme Court has been reluctant to expand the scope of quasi-suspect classifications. In fact, since adding illegitimacy in 1977, the Supreme Court has declined every opportunity to recognize a new quasi-suspect class." *Id.* at *20 (collecting cases). There is "little guidance for determining whether intermediate scrutiny should apply to classifications based on characteristics beyond sex or illegitimacy." *Id.* at *19.

This Court could locate no case in which a cisgender plaintiff alleged that their equal protection rights were violated because they were treated less favorably than a transgender or non-binary individual. A number of courts have decided cases involving the reverse, i.e., a transgender plaintiff alleging they were treated less favorably than similarly situated cisgender individuals. Many of these courts "have analyzed the relevant factors for determining suspect class status and held that transgender people are at least a quasi-suspect class." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020) (collecting cases); *see also id.* at 611 (extrapolating from Supreme Court precedent four factors to consider when recognizing a new quasi-suspect class: whether the class has historically been subject to discrimination; whether the class has a defining characteristic that bears a relation to its ability to perform or contribute to society; whether the class may be defined as a discrete group by an "obvious, immutable, or distinguishing characteristic[]"; and whether the class is a minority class lacking political power).

Nearly two decades ago, the Tenth Circuit decided *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995). In *Brown*, a transgender inmate alleged that her equal protection rights were violated when prison officials denied her access to estrogen treatment. 63 F.3d at

969.  The Tenth Circuit declined to hold that the plaintiff was a member of a quasi-suspect class, relying on the now-overruled Ninth Circuit decision in *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659 (9th Cir. 1977), *overruling recognized in Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000)).  *See Brown*, 63 F.3d at 971 (stating that "[r]ecent research . . . suggests reevaluating *Holloway*" but "declin[ing] to make such an evaluation in this case" and instead following *Holloway*).  To date, the Tenth Circuit has not decided whether transgender individuals are members of a quasi-suspect class.  *See Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015).  District courts within the Tenth Circuit remain obligated to follow *Brown* and apply rational basis scrutiny when a transgender person brings an equal protection claim alleging discrimination based on their transgender status.  *See, e.g.*, *Griffith v. El Paso Cnty.*, No. 21-cv-00387-CMA-NRN, 2023 WL 2242503, at *10 (D. Colo. Feb. 27, 2023), *report and recommendation adopted*, 2023 WL 3099625 (D. Colo. Mar. 27, 2023), *appeal docketed*, No. 23-1135 (10th Cir. Apr. 26, 2023); *Poe v. Drummond*, No. 4:23-cv-00177-JFH-SH, 2023 WL 6516449, at *7 (N.D. Okla. Oct. 5, 2023), *appeal docketed*, No. 23-5110 (10th Cir. Oct. 10, 2023); *Fowler*, 2023 WL 4010694, at *21.

While *Brown* and its progeny are not directly on point because M.L. does not claim discrimination based on transgender status, but *cis*gender status, the Court finds that these cases lend support to the conclusion that rational basis scrutiny is appropriate here. If the Court is bound by *Brown*'s holding that transgender individuals are not members of a quasi-suspect class, the Court simply cannot conclude that cisgender individuals are members of a quasi-suspect class by virtue of their cisgender status, particularly where "the Supreme Court has been reluctant to expand the scope of quasi-suspect

41

classifications." *Fowler*, 2023 WL 4010694, at *20; *see also Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018) ("[O]ther than certain races, one would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment, than transgender people."). And Plaintiffs make no argument explaining why the Court should recognize a new quasi-suspect class. *See* [Doc. 37]. For these reasons, the Court agrees with Defendants that rational basis scrutiny applies here.

### 3.    Defendants' Alleged Policy Passes Constitutional Scrutiny

Finally, the Court must determine whether Defendants' alleged policy of providing gender support plans only to transgender or non-binary students is rationally related to a legitimate government interest. Courts "accord a strong presumption of validity to [government actions] that neither involve fundamental rights nor proceed along suspect lines." *City of Herriman v. Bell*, 590 F.3d 1176, 1194 (10th Cir. 2010). A court will strike down the government's action only "if the state's classification 'rests on grounds *wholly irrelevant* to the achievement of the State's objective.'" *Id.* (emphasis in original) (quoting *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 71 (1978))). "Because a classification subject to rational basis review 'is presumed constitutional, the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Petrella v. Brownback*, 787 F.3d 1242, 1266 (10th Cir. 2015) (quoting *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012)).

"In the context of a motion to dismiss under 12(b)(6), this court accepts all of the allegations in the complaint as true and then considers these 'facts' according to the

Addenda 043

deferential rational basis standard." *Teigen v. Renfrow*, 511 F.3d 1072, 1083 (10th Cir. 2007). "To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Id.* (quotation omitted). The determination whether there is a conceivable basis for the government's classification "is a legal question which need not be based on any evidence or empirical data." *Id.* at 1084. But the Court is not limited to the Parties' arguments in determining what government interests the classification seeks to further. *Id.* "In fact, this Court is *obligated* to seek out other conceivable reasons for validating a state policy." *Id.* (quotation and alteration marks omitted) (emphasis in original).

Defendants contend that the District has a legitimate interest in "providing a safe and supportive environment for all its students, including those who are transgender or gender nonconforming." [Doc. 29 at 7]. They also contend that the District has an interest in "adhering to prohibitions against discrimination for sexual orientation, gender expression, or gender identity in state law and District policy while providing educational services to students." [*Id.* at 12]. The Court agrees that these are legitimate government interests. *See Vesely v. Ill. Sch. Dist. 45*, No. 1:22-cv-02035, 2023 WL 2988833, at *5 (N.D. Ill. Apr. 18, 2023); *see also Prince v. Massachusetts*, 321 U.S. 158, 168 (1944) ("A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens.").

The Court also finds that the District's policy of providing gender support plans to transgender or gender non-conforming students is rationally related to this objective. Here, the stated reason for the District's classification appears on the face of the Complaint. Plaintiffs allege that a gender support plan

Addenda 044

> is intended to support a transgender or non-binary student in gaining access to a school environment that is affirming and is free from discrimination and harassment on the basis of gender identity and gender expression. Cisgender and gender normative students inherently have access to a gender-affirming school environment based on this held identity, and an Individual Gender Support Form's purpose is to work to ensure this access for students who have historically faced discrimination and harassment on the basis of gender identity and gender expression.

[Doc. 1 at ¶ 176 (emphasis omitted)]. In other words, the District's reason for providing gender support plans to transgender students is to provide those students access to a supportive environment to which the District says that cisgender students already "inherently" have access. And if the District believes that cisgender students already have access to a gender-affirming environment, such that there is no need to provide gender support plans to these students, the District's classification is rationally related to that legitimate interest. *See City of Herriman*, 590 F.3d at 1194 (explaining that government conduct will be deemed unconstitutional only where it rests on grounds "wholly irrelevant" to the achievement of the state's objective). To the extent Plaintiffs could argue that gender-normative students do not have access to an affirming or supportive environment at District schools because, as Plaintiffs allege, these students experience gender-based pressure from District personnel, *see, e.g.*, [Doc. 1 at ¶¶ 54, 102], "[t]he fact that a [policy] is imperfect does not make it irrational," *Fowler*, 2023 WL 4010694, at *23, and the government "must be allowed leeway to approach a perceived problem incrementally," *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 316 (1993).

Plaintiffs have not alleged any facts to overcome the presumption of rationality applied to the District's classifications. *See generally* [Doc. 1 at ¶¶ 78–89, 166–82, 223–31]. In their Response, they contend that Defendants' alleged actions fail to pass rational basis review because Defendants withheld a benefit from M.L. "because of his

44

'sexual orientation, gender identity, [or] gender expression'" and because "[i]t is impossible for there to be a reasonable fit between an interest of 'adhering to prohibitions against discrimination' and a policy that is itself discriminatory."  [Doc. 37 at 12 (first alteration in original) (citing Colo. Rev. Stat. § 24-34-601(2)(a)].  Plaintiffs' argument ignores the fact that the Equal Protection Clause "does not forbid classifications" outright, *Nordlinger*, 505 U.S. at 10, and permits the government to "treat unlike cases accordingly," *Vacco*, 521 U.S. at 799.  And again, Plaintiffs have not asserted a state-law discrimination claim, and they have cited no case law demonstrating that the Court could or should analyze the propriety of Defendants' conduct under Colorado state law to determine whether it passes constitutional scrutiny.  *See* [Doc. 37 at 12]; *see also Beach Commc'ns*, 508 U.S. at 313 ("[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.").  Plaintiffs fail to address Defendants' legitimate interest in providing a means to ensure that gender non-conforming students experience a non-discriminatory and gender-affirming environment, and thus, they fail to "negative every conceivable basis which might support" the government's actions. *Petrella*, 787 F.3d at 1266.

Because Defendants' classifications are rationally related to a legitimate state interest, the Court concludes that M.L. and the Lees as M.L.'s next friends have failed to state a claim under the Equal Protection Clause.  The Motion to Dismiss is thus **GRANTED** with respect to Count II, and Count II is **DISMISSED without prejudice** under Rule 12(b)(6).  The Court does not reach Defendants' remaining arguments.

**CONCLUSION**

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Defendants' Motion to Dismiss Plaintiffs' Complaint [Doc. 29] is **GRANTED**;

(2)    Count I is **DISMISSED without prejudice** for lack of subject matter jurisdiction under Rule 12(b)(1) to the extent it is asserted by H.J., C.L., or M.L.;

(3)    Count I is **DISMISSED without prejudice** for failure to state a claim under Rule 12(b)(6) to the extent it is asserted by Jonathan Lee, Erin Lee, Nicolas Jurich, and Linnaea Jurich;

(4)    Count II is **DISMISSED without prejudice** for failure to state a claim under Rule 12(b)(6);

(5)    On or before **January 9, 2024**, Plaintiffs may file a motion to amend that complies with the Local Rules and the Federal Rules of Civil Procedure; and

(6)    If no such motion to amend is filed by the Court's deadline, the Court will direct the Clerk of Court to close this case.

DATED:  December 19, 2023        BY THE COURT:

Nina Y. Wang
United States District Judge

Addenda 047

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 23-cv-01117-NYW-STV

JONATHAN LEE,
ERIN LEE,
C.L., a minor, by and through parents Jonthan and Erin Lee as next friends,
M.L., a minor, by and through parents Jonathan and Erin Lee as next friends,
NICOLAS JURICH,
LINNAEA JURICH, and
H.J., a minor, by and through parents Nicolas and Linnaea Jurich as next friends,

     Plaintiffs,

v.

POUDRE SCHOOL DISTRICT R-1, and
POUDRE SCHOOL DISTRICT R-1 BOARD OF EDUCATION,

     Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

     This matter is before the Court on Plaintiffs' Amended Motion for Leave to Amend Complaint (Oral Argument Requested) (the "Motion to Amend") [Doc. 64, filed January 18, 2024].[1]  The Court has reviewed the Motion, the Parties' briefing [Doc. 67; Doc. 68], and the applicable case law, and concludes that oral argument would not materially assist in the resolution of the Motion.  For the reasons set forth in this Order, the Motion to Amend is respectfully **DENIED**.

---

[1] This Court uses the convention of [Doc.__] and the page number assigned by the Court Management/Electronic Court Files ("CM/ECF") system for this District to refer to materials filed in this action.

**BACKGROUND**

The Court has discussed the background of this action previously, *see* [Doc. 58], and will limit its discussion here accordingly.

***Original Complaint.***  On May 3, 2023, Plaintiffs Jonathan Lee ("Mr. Lee"); Erin Lee ("Ms. Lee"); C.L., a minor, by and through parents Jonthan and Erin Lee as next friends; M.L., a minor, by and through parents Jonathan and Erin Lee as next friends; Nicolas Jurich ("Mr. Jurich"); Linnaea Jurich ("Ms. Jurich," and collectively with Mr. Lee, Ms. Lee, and Mr. Jurich, the "Plaintiff Parents"); and H.J., a minor, by and through parents Nicolas and Linnaea Jurich as next friends, initiated this action by filing a Complaint for Damages and Injunctive Relief (the "Original Complaint") against Defendant Poudre School District R-1 (the "District") and the Poudre School District Board of Education (the "Board").  [Doc. 1].  The District is a K-12 public school district in Larimer County, Colorado, and its schools include Rice Elementary School ("RES") and Wellington Middle School ("WMS"), which is now consolidated into Wellington Middle-High School.  [*Id.* at ¶¶ 12, 15–16, 22].

In their Original Complaint, Plaintiffs alleged that the District ran an after-school organization called the Genders and Sexualities Alliance ("GSA") at a number its schools, which was not disclosed as part of the District curriculum.  [*Id.* at ¶¶ 28–30].  Plaintiffs alleged that GSA meetings "regularly address sex, sexualities, mental health, suicide, sexual orientation, gender identities, and other topics in discussions, lectures, and distributed materials."  [*Id.* at ¶ 123].  Plaintiffs alleged that a GSA meeting was held at WMS on May 4, 2021, and following the meeting, C.L., then a twelve-year-old sixth grader at WMS, announced to her mother, Ms. Lee, that "she would be transitioning," although

2

she had never expressed such sentiments to her parents before.  [*Id.* at ¶¶ 66–67].
Plaintiffs alleged that "C.L.'s experience at the GSA club led to a months-long emotional
decline of gender and sexuality confusion that required counseling and included suicidal
thoughts."  [*Id.* at ¶ 75].

Additionally, M.L., the seven-year-old son of Mr. and Ms. Lee (the "Lees"), was a
first grader at RES in May 2021.  [*Id.* at ¶¶ 16, 78].  The Lees alleged that they learned
that the District offers gender support plans that "prohibit harassment based on gender
identities or gender expressions" and that "oblige [District] personnel to use the elected
pronouns and names identified" in a plan when speaking with or about the child who is
the subject of the plan.  [*Id.* at ¶¶ 79, 81].  The Lees completed gender support forms for
M.L. on three separate occasions, requesting that District personnel refer to M.L. by his
biological sex and birth name, but the District denied their request because, they alleged,
"gender support plans exist only to benefit and protect the gender identities of transgender
children, whereas the Lees sought a gender support plan binding the [District] to benefit
and protect the gender identity of their son, including his name and masculine pronouns."
[*Id.* at ¶¶ 85, 86, 178].

Plaintiffs further alleged that H.J., then a twelve-year-old sixth grader at WMS,
attended GSA meetings on May 11 and May 18, 2021.  [*Id.* at ¶¶ 90, 97].  After attending
the GSA meetings, H.J. "began to have her first suicidal thoughts."   [*Id.* at ¶ 113].
Throughout the summer of 2021, H.J. began leaving notes for her parents, Mr. Jurich and
Ms. Jurich (the "Juriches"), about "transgenderism" and being aromantic or asexual.  [*Id.*
at ¶ 114].  In the fall of 2021, H.J. began to question her gender identity.  [*Id.* at ¶ 115].
H.J. then "underwent a significant emotional decline," and in December 2021, requested

3

to be homeschooled.  [*Id.* at ¶ 117].  Shortly thereafter, H.J. attempted suicide.  [*Id.* at ¶ 118].  H.J., C.L., and M.L. no longer attend District schools.  [*Id.* at ¶¶ 15–16, 20].[2]

Plaintiffs alleged that the District and the Board engaged in a pattern and practice of keeping the GSA activities secret from District parents in that they failed to disclose GSA activities to parents and encouraged students to not discuss GSA activities with their parents.  [*Id.* at ¶¶ 31–33]; *see also, e.g.*, [*id.* at ¶¶ 58, 104].  Plaintiffs alleged that, in the District, school-sponsored clubs are "considered part of the school program and/or relate[] to a school's curriculum," [*id.* at ¶ 184], and that the District has a policy that requires written notice to parents or guardians of any curriculum that is "part of the District's comprehensive health education program," which includes notice that the parents or guardians may excuse their children from some or all of the comprehensive health education program, [*id.* at ¶ 134].  The Lees and the Juriches contended that they were not given notice of the GSA's activities, agenda, or materials; otherwise, "they would have elected to opt their child out based on [their] deeply held religious beliefs."  [*Id.* at ¶¶ 76, 109, 124–26].

Plaintiffs asserted two claims against Defendants pursuant to 42 U.S.C. § 1983: (1) a Fourteenth Amendment substantive due process claim alleging a "[d]enial of [the] right of the Plaintiff Parents to direct the education and upbringing of the Plaintiff Children," asserted by all Plaintiffs against all Defendants, [*id.* at ¶¶ 205–22]; and (2) a Fourteenth Amendment equal protection claim based on the District's denial of a gender support plan

---

[2] C.L. was not a student at WMS as of May 14, 2021.  [Doc. 64-2 at ¶¶ 94–95].  H.J. was homeschooled in or about December 2021 for the remainder of the 2021–2022 school year, and left permanently "[s]hortly after the start of the 2022-2023 school year."  [*Id.* at ¶¶ 130–132].

4

for M.L., asserted against both Defendants by Mr. Lee, Ms. Lee, and M.L., [*id.* at ¶¶ 223–31]. They requested the following relief: (1) a permanent injunction requiring (a) that the District provide notice and opt-out rights if gender dysphoria, gender transitioning, or related topics are taught in the District, (b) that these topics only be taught by qualified and trained professionals, and (c) that all materials used in any such instruction be given to parents fourteen days in advance of any instruction; (2) compensatory damages, including the costs of private-school tuition, medical expenses, counseling fees, compensation for damage to Plaintiffs' reputation, transportation, and emotional anguish; and (3) punitive damages. [*Id.* at 30–31].

On July 7, 2023, Defendants moved for dismissal of the Original Complaint. [Doc. 29]. After full briefing on the merits, this Court granted Defendants' Motion to Dismiss. [Doc. 58]. The Court concluded that the minors, H.J., C.L., and M.L., lacked standing to bring a Fourteenth Amendment substantive due process claim rooted in the right of parents to make decisions concerning the care, custody, and control of their children. [*Id.* at 12–13]. The Court further found that the Plaintiff Parents lacked standing to seek any prospective injunctive relief, because none of their children continued to attend District schools. [*Id.* at 17]. Finally, the Court concluded that the Plaintiff Parents had not adequately stated a violation of the Fourteenth Amendment. [*Id.* at 28]. In addition, the Court concluded that M.L., and the Lees as his next friends, had failed to state a claim under the Equal Protection Clause. [*Id.* at 45]. The Court granted Plaintiffs leave to file a motion to amend. [*Id.* at 46].

***Motion to Amend.*** The Plaintiff Parents filed the instant Motion to Amend on January 18, 2024. [Doc. 64]. In the proposed First Amended Complaint, the Plaintiff

5

Parents assert a sole Fourteenth Amendment substantive due process claim against the District, again invoking § 1983.  [*Id.* at 2; Doc. 64-1; Doc. 64-2].  Although many of the factual allegations remain the same, *see* [Doc. 64-1], the Plaintiff Parents describe "[t]he most important change . . . is [the proposed First Amended Complaint's] focus on the broad policy of the District to unconstitutionally interfere with the parent/child relationship."  [Doc. 64 at 2].  The Plaintiff Parents identify this broad policy as "the District Secrecy Policy."[3]  [*Id.*; Doc. 64-2 at ¶ 32].  In addition, the Plaintiff Parents have abandoned their requests for injunctive relief and punitive damages.  [Doc. 64-2 at 39].  Instead, the Plaintiff Parents seek compensatory damages (including private school tuition, medical expenses, counseling fees, compensation for damage to the Plaintiffs' reputation, transportation, and emotional anguish); reasonable attorneys' fees and costs; and "[a]ny and all other relief that the Court deems appropriate."  [*Id.* at 40].

In the proposed First Amended Complaint, the Plaintiff Parents allege that the District has engaged in a custom and practice of secrecy which manifests itself through verbal statements by the District's agents as well as its written policies.  [*Id.* at ¶¶ 32–33].  They allege that the District engaged in a pattern and practice of keeping GSA activities secret from parents by not disclosing the GSA as part of the District's curriculum and that "agents of the Defendant District who led the GSA meetings actively encouraged the children to treat the discussions as secret."  [*Id.* at ¶¶ 34, 37, 39].  Though the proposed First Amended Complaint is not entirely clear as to the definition of the "District Secrecy Policy," the Plaintiff Parents point to several elements, including:  (1) "Policy IHAM," which

---

[3] Consistent with its obligations at this juncture of the case, this Court construes the proposed First Amended Complaint in the light most favorable to the Plaintiff Parents and uses their terminology without passing on the substantive merits.

Addenda 053

they describe as "illusory" because it "deliberately mollifies parental anxiety and caution" by providing that written notice will be provided before the commencement of any unit or lesson that is part of the District's comprehensive health education program at a child's school to allow parents to excuse their student, [*id.* at ¶ 152]; (2) "Policy KD Public Information and Communications" that "obliges [the District] and the schools therein to '[k]eep the public informed about the **policies**, administrative operations, objectives, and **educational programs** of the schools," [*id.* at ¶ 159]; (3) the Guidelines for Supporting Transgender and Non-Binary Students ("Guidelines"), [*id.* at ¶ 162];[4] (4) the Gender Support FAQ,[5] which "announces that school staff will not inform a parent or guardian of conversations that school staff privately have with their child regarding sex, sexual orientation, or gender identity," [*id.* at ¶ 174]; (5) a toolkit for Supporting Transgender and Gender Expansive Nonconforming Students which states that "'[p]rior to notification of any parent/guardian or guardian [sic] regarding the transition process, school staff should work closely with the student to assess the degree, **if any**, the parent/guardian will be involved in the process' of the child's gender transition," [*id.* at ¶ 181]; (6) the gender support forms, which may be completed wholly by a child without parental notice or

---

[4] The Guidelines are attached to Plaintiff Parents' proposed First Amended Complaint. [Doc. 64-2 at 43–56]. The Court previous noted that these Guidelines were dated January 13, 2023. [Doc. 58 at 2 n.1]. But in its Response to the Motion to Amend, the District does not dispute their authenticity, seemingly adopts the Guidelines as in effect in 2021, and argues that the Court may consider them in the context of a motion to dismiss. *See* [Doc. 67 at 5].

[5] The Plaintiff Parents cite to https://www.psdschools.org/programs-services/PSD-Gender-Support-FAQs, accessed on May 2, 2023. [Doc. 64-2 at ¶ 174 & n.2]. This Court accessed the website on May 16, 2024. It is not clear that these FAQs were in place, or what they said, in 2021 when the incidents giving rise to this action occurred.

Addenda 054

consent, [*id.* at ¶ 186]; and (7) the District's de facto policies, including WMS's GSA, [*id.* at ¶ 191].

With respect to these de facto policies, the Plaintiff Parents aver that Jenna Riep, a WMS teacher, personally invited C.L. to attend the GSA club meeting, describing it as an after-school club called the "GSA Art Club." [*Id.* at ¶ 49]. They allege that the principal of WMS, Kelby Benedict ("Mr. Benedict"), confirmed to Mr. Lee that "in order to create a 'safe space,' the GSA clubs created an expectation of confidentiality, and students were strongly encouraged to keep the discussions at GSA meetings private." [*Id.* at ¶ 96]. Further, the Plaintiff Parents allege that the District[6] never provided the Lees notice of the GSA's activities, agenda, or materials; that an employee of the District would solicit C.L.'s attendance without notice and consent from her parents; and that the District had a policy of keeping these topics secret from parents and encouraging children to do the same. [*Id.* at ¶ 98].

Finally, the Plaintiff Parents allege that District personnel are "regularly encouraged" to attend professional training sessions during which they are trained to "not reveal a student's in-school transgender or gender non-conforming identity to that student's parents." [*Id.* at ¶ 207]. They also allege that there is a "common practice" amongst District personnel to discuss the best means of circumventing parental notice when students seek to use alternative names and pronouns in school. [*Id.* at ¶ 210]. To that end, they aver that District officials consistently directed personnel to avoid revealing the divergent name and pronoun use to parents. [*Id.* at ¶ 214]. The Plaintiff Parents point

---

[6] The Plaintiff Parents use the terminology "No Defendant" to frame this allegation. [Doc. 64-2 at ¶ 98]. However, as noted above, the District is the only remaining defendant in the proposed First Amended Complaint. *See* [*id.* at 1].

to examples of unnamed District officials providing guidance to District personnel, including deferring to the student's use of their preferred name and pronouns in school, while using their given name and pronouns in communications with parents. [*Id.* at ¶ 217].

## LEGAL STANDARDS

### I.    Motion to Amend

Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Because the Plaintiff Parents filed the Motion to Amend before any deadline for amending pleadings, this Court considers only whether they have satisfied the Rule 15(a) standard. *See Fernandez v. Bridgestone/Firestone, Inc.*, 105 F. Supp. 2d 1194, 1195 (D. Colo. 2000); *cf. Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Assoc.*, 771 F.3d 1230, 1242 (10th Cir. 2014) (adopting two-prong analysis and considering whether both Rule 16(b)(4) and Rule 15(a) are satisfied when a motion to amend is submitted after deadline included in scheduling order). Refusing leave to amend "is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir.1993). A general presumption exists in favor of allowing a party to amend its pleadings, *see Foman v. Davis*, 371 U.S. 178, 182 (1962), and the non-moving party bears the burden of showing that the proposed amendment is sought in bad faith, that it is futile, or that it would cause substantial prejudice, undue delay or injustice, *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Inv. Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999).

Addenda 056

## II.    Substantive Due Process

*Fourteenth Amendment*.   The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."   U.S. Const. amend. XIV, § 1.   The Due Process Clause "includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'"  *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).   "[T]he Supreme Court recognizes two types of substantive due process claims:   (1) claims that the government has infringed a 'fundamental' right, . . . and (2) claims that government action deprived a person of life, liberty, or property in a manner so arbitrary it shocks the judicial conscience."  *Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019) (citing *Glucksberg*, 521 U.S. at 721–22, and *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

Different standards apply to the respective approaches.   Under the fundamental rights approach, the Fourteenth Amendment Due Process Clause "forbids the government to infringe fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."  *Glucksberg*, 521 U.S. at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).   If the plaintiff fails to establish that the challenged action implicates a "fundamental right," then there only a "reasonable relation to a legitimate state interest" is required for constitutional purposes.   *Id.* at 722.   The standard is higher for the shocks-the-conscience approach. *See e.g.*, *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 680 F. Supp. 3d 1250, 1278 (D. Wyo. 2023).   In determining whether a plaintiff has asserted a violation of substantive due process under the shocks-the-conscience approach is "whether the

Addenda 057

challenged government action shocks the conscience of federal judges." *Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006) (citing *Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002)).

 ***Monell Liability.***  Under the law of the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit"), liability for constitutional violations pursuant to § 1983 may exist against governmental entities, like school districts, without liability against a particular individual.  *See Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1144 (10th Cir. 2023).  But liability against the District cannot be based on a respondeat superior theory, i.e., solely because the governmental entity employs a person or people who violated a plaintiff's constitutional rights.  *See Dorsey v. Pueblo Sch. Dist. 60*, 140 F. Supp. 3d 1102, 1119 (D. Colo. 2015) (citing *Lawrence v. Sch. Dist. No. 1*, 560 F. App'x 791, 794 (10th Cir. 2014)); *see also Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000) (applying *Monell* to school district).  Instead, a school district may only be held liable if the constitutional violation arises from an official policy or custom or was carried out by an official with final policy making authority with respect to the challenged action.  *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694–95 (1978).  An official policy or custom under *Monell* may take several forms, including:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (cleaned up).

Addenda 058

It is also not enough for a plaintiff to simply identify a policy or custom—the plaintiff must also "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. Of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). The challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right—often described as "the moving force." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013).

Finally, the plaintiff must demonstrate that the challenged policy was enacted with deliberate indifference. A plaintiff may show deliberate indifference by alleging that the municipality had actual or constructive notice that its action (or its failure to act) was substantially certain to result in a constitutional violation and that the municipality consciously and deliberately chose to disregard that risk. *Finch v. Rapp*, 38 F.4th 1234, 1244 (10th Cir. 2022). A municipality may be on notice through a pattern of tortious conduct or "if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction." *Id*. (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998)).

## ANALYSIS

The sole claim in the proposed First Amended Complaint is a substantive due process claim that alleges a violation of the fundamental right of parents to direct the education and upbringing of their children based on the "District Secrecy Policy." *See generally* [Doc. 64; Doc. 64-2]. The District opposes Plaintiffs' request to amend on futility grounds. *See* [Doc. 67]. It argues that the proposed First Amended Complaint still fails to plead a Fourteenth Amendment violation because it "is still based on a narrow right to control [the Plaintiff Parents'] children's education," [*id.* at 2–11], and alternatively

12

contends that Plaintiffs fail to meet the pleading requirements for municipal liability under *Monell*, [Doc. 67 at 13–15].

A proposed amendment is futile if the complaint, as amended, would be subject to dismissal. *Moody's Inv. Servs.*, 175 F.3d at 859. "If a party opposes a motion to amend or to supplement on the grounds of futility, the court applies the same standard to its determination of the motion that governs a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *Conkleton v. Zavaras*, No. 08-cv-02612-WYD-MEH, 2010 WL 6089079, at *3 (D. Colo. Oct. 6, 2010). Therefore, the Court must determine if the proposed pleading contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff may not rely on conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Whether to allow amendment or to dismiss pursuant to a futility analysis is within the trial court's discretion. *Burks v. Okla. Publ'g Co.*, 81 F.3d 975, 978–79 (10th Cir. 1996); *see also Frank*, 3 F.3d at 1365. Thus, the Court, taking all factual averments as true and drawing them in favor of the Plaintiff Parents, now turns to considering whether amendment is futile.

I.    **The Plaintiff Parents' Arguments**

As previously acknowledged, the right of parents "to make decisions concerning the care, custody, and control of their children" has been recognized as a fundamental right. *Troxel*, 530 U.S. at 66. This protection includes a parent's right to direct a child's education. *Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998). This right can be traced back to *Meyer v. Nebraska*, 262 U.S. 390 (1923), and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925). In *Meyer*, the Supreme

Court held that a law requiring that school lessons be in English was unconstitutional because it infringed on parents' due process rights to direct the education of their children. 262 U.S. at 399–401.  And in *Pierce*, the Supreme Court held that a law which required public-school attendance for children ages eight to sixteen also "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control."  268 U.S. at 534–35.  *Meyer* and *Pierce* "evince the principle that the state cannot prevent parents from choosing a specific educational program—whether it be religious instruction at a private school or instruction in a foreign language," and cannot otherwise "completely foreclos[e] the opportunity of individuals and groups to choose a different path of education."  *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 533 (1st Cir. 1995), *abrogated in part on other grounds by DePoutot v. Raffaelly*, 424 F.3d 112, 118 n.4 (1st Cir. 2005).

But the Supreme Court has stressed the "limited scope" of this authority.  *Norwood v. Harrison*, 413 U.S. 455, 461 (1973); *see also, e.g.*, *Pierce*, 268 U.S. at 534 ("No question is raised concerning the power of the state reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare."); *Meyer*, 262 U.S. at 402 (recognizing the state's right to "compel attendance at some school," "make reasonable regulations for all schools," and "prescribe a curriculum for institutions which it supports").  Indeed, the Tenth Circuit (like other circuits) recognizes that this right only extends so far.  *See, e.g.*, *Swanson*, 135 F.3d at 699 (explaining that

14

the right is "limited in scope" and that "parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject"); *see also Leebaert v. Harrington*, 332 F.3d 134, 141 (2d Cir. 2003) ("*Meyer*, *Pierce*, and their progeny do not begin to suggest the existence of a fundamental right of every parent to tell a public school what his or her child will and will not be taught."); *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1207 (9th Cir. 2005) (holding that the parental right to direct the care, custody, and control of children "does not extend beyond the threshold of the school door"). The Sixth Circuit has described the limits of the right as follows:

> While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child. Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or . . . a dress code, these issues of public education are generally "committed to the control of state and local authorities."

*Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395–96 (6th Cir. 2005) (quoting *Goss v. Lopez*, 419 U.S. 565, 578 (1975)). "These decisions make clear that a parent has the right to control where their child goes to school. But that is where their control ends." *Doe v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 3:22-cv-00337-MJN-PBS, 2023 WL 5018511, at *13 (S.D. Ohio Aug. 7, 2023), *appeal docketed*, No. 23-3740 (6th Cir. Sept. 8, 2023).

In their proposed First Amended Complaint, the Plaintiff Parents assert that their Fourteenth Amendment parental rights were violated by a "District Secrecy Policy," under which District personnel fail to provide parents full and correct information regarding curriculum and actions taken by District personnel involving gender identification issues. *See generally* [Doc. 64-2]. The Plaintiff Parents insist that they are not challenging the

15

District's substantive curriculum or policies regarding transgender and gender identification issues, but argue that the District Secrecy Policy violated their fundamental right to choose *whether* to maintain their children's enrollment in District schools. [Doc. 68 at 3]. Specifically, the Lees and the Juriches argue that Ms. Riep's and Mr. Benedict's conduct under the District Secrecy Policy interfered with their fundamental right to decide *whether* to send their kids to WMS. [Doc. 64 at 11]. The Plaintiff Parents allege that had they been provided notice of the topics planned for discussion at the GSA meetings, they would have elected to opt their children out of District schools and sought alternative education based on their deeply held religious beliefs. [Doc. 64-2 at ¶ 143]. They further aver that the District "knew or should have known that the failure to provide notice, coupled with affirmative steps to discuss the topics secretly, would necessarily undermine parental authority and informed parental decision-making on whether to seek alternative education for their children." [*Id.* at ¶ 147]. In other words, the Plaintiff Parents attempt to re-frame their alleged constitutional injury as a violation of their fundamental right to choose whether their child attends District schools, *see* [Doc. 64 at 3], which is consistent with how the district court framed the Fourteenth Amendment issue in *Willey v. Sweetwater County School District No. 1 Board of Trustees*, 680 F. Supp. 3d 1250 (D. Wyo. 2023), though that case is not cited in any of the Plaintiff Parents' briefing.

While the Court is not bound to the framework of the Plaintiff Parents' or another district court's constitutional analysis, *see United States v. Rhodes*, 834 F. App'x 457, 462 (10th Cir. 2020) ("[D]istrict courts in this circuit are bound by [Tenth Circuit] decisions and those of the United States Supreme Court—they are not bound by decisions of other

Addenda 063

district courts"), it need not decide that issue.[7]  Because this Court finds that the Plaintiff Parents have inadequately alleged *Monell* liability, it focuses its analysis accordingly.

## II.    *Monell* Liability

---

[7] The Court notes that, despite the Plaintiff Parents' attempt to re-frame their claim, the core of their claim remains the assumption that they have a right to receive notice and information about topics discussed within an after-school, voluntary extracurricular club and the manner in which school employees address students.  *See, e.g.*, *generally* [Doc. 64-2 at ¶¶ 142–43, 146–48].  Significantly, the Plaintiff Parents direct the Court to no Supreme Court or Tenth Circuit authority demonstrating that the Fourteenth Amendment confers a constitutional right to receive "full and correct information" about topics discussed in the District's curriculum, and particularly, at after-school, voluntary extracurricular clubs that they may find objectionable, so that they may exercise their right to withdraw their children from the District.  *See generally* [Doc. 64].

There is also no clear weight of authority from district courts to suggest the Fourteenth Amendment confers a substantive due process right to receive information. *See Bethel Loc. Sch. Dist. Bd. of Educ.*, 2023 WL 5018511, at *13–14 (holding that the district's alleged refusal to answer parents' questions about bathroom policies "[did] not implicate a parent's fundamental right to control their children's upbringing," reasoning that "the Fourteenth Amendment does not confer parents with an unfettered right to access information about what their children are learning," to "interject in how a State school teaches children," or to receive an "answer [to] every demand made of them from frustrated parents (no matter how reasonable that frustration may be)."); *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 622 F. Supp. 3d 118, 136 (D. Md. 2022) (concluding that parents did not have a fundamental right to be promptly informed of their child's gender identity when it differs from the identity of the child at birth, regardless of the child's wishes or any concerns regarding the potential detrimental impact upon the child), *vacated and remanded on other grounds*, 78 F.4th 622 (4th Cir. 2023).  Even the *Willey* court did not find one.  *See Willey*, 680 F. Supp. at 1280 (in the context of a preliminary injunction, declining to find an affirmative obligation on the District under the Constitution to actively disclose information regarding a student in the absence of a parent's inquiry or request).

The Supreme Court has long warned that, "[a]s a general matter, [it] has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended."  *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).  To that end, "[courts] must . . . exercise the utmost care whenever [they] are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of [courts]."  *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 240 (2022) (quoting *Glucksberg*, 521 U.S. at 720).

Addenda 064

The Tenth Circuit has directed lower courts to apply requirements of *Monell* rigorously to avoid collapsing municipal liability into respondeat superior liability. *Schneider*, 717 F.3d at 772. The District may only be held liable for the constitutional violations of its employees if they were taken pursuant to a District policy or custom; thus, the Court turns to whether the Plaintiff Parents have adequately alleged facts to allow a factfinder to conclude that such a policy or custom existed. The Plaintiff Parents allege that the District Secrecy Policy "prevents parents from being informed about unilateral decisions the District takes regarding the best interests of their children, and prevents parents from being fully informed about the nature of the District's curriculum." [Doc. 64-2 at ¶ 32]. They argue that the District Secrecy Policy is comprised of both the Guidelines and informal customs resulting in a widespread practice of preventing them from receiving "[f]ull and correct information" regarding their children. [Doc. 64 at 7–9, 11]. The District argues in response that Plaintiffs fail to allege the existence of a widespread practice or custom, as required for *Monell* liability, because their allegations "relate to a sole District employee (Ms. Riep) in relation to one GSA club at a single District school over a narrow span of time." [Doc. 67 at 14]. Plaintiffs respond that their Motion to Amend "articulate[s] numerous instances in which C.L. and H.J. were impressed upon to distrust their parents," and that they "clearly articulated numerous instances in which District employees complied with or sought to comply with the District's Secrecy Policy." [Doc. 68 at 9].

### A.    The Guidelines

The Plaintiff Parents have attached the Guidelines to their proposed First Amended Complaint, [Doc. 64-2 at 43–56], and neither side disputes the Court's ability to consider them. To the extent that there is a conflict between the allegations by the

18

Plaintiff Parents about the Guidelines or any other source documentation, to the extent that the written document has been provided, it controls. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017).  The Guidelines do not prohibit disclosure to parents or guardians of information regarding a student's gender status or any curriculum regarding gender identity and gender expression issues, including but not limited to extracurricular GSA meetings.  The Guidelines provide that "[s]tudents have a general right to keep their transgender or non-binary status private from other students, parents, or third parties."  [Doc. 64-2 at 45].  They further state:

> When contacting or communicating with a parent/guardian of a transgender or non-binary student, school staff should use the name and pronouns that the student's parent/guardian use, unless the student requests otherwise.  If a parent/guardian asks a staff member about whether their student uses another name/pronoun at school or has other gender-related questions, the staff member should refer them to the school counselor, who can address questions and concerns that the parent/guardian may have.  If a school counselor receives questions from a parent/guardian, they should use their professional judgment to determine how best to follow up with the student and then the parent/guardian.

[*Id.*].  The Guidelines provide that parents and guardians have the right under the federal Family Educational Rights and Privacy Act ("FERPA") to view all of their student's educational records, including a student's gender support form.  [*Id.*].  And parent or guardian signatures are specifically required for transgender and non-binary students to request their name and/or gender be updated in Synergy, the District's internal record-keeping system, or if such signature is not available, District staff will notify the parents/guardians prior to making an update to Synergy.  [*Id.* at 46].  There is no direction in the Guidelines that requires or even suggests that instructors of gender-inclusive clubs should encourage students who are attending to confide in teachers rather than their

parents, or to hide their attendance or the topics of discussion from their parents.  [*Id.* at 52].

As for Plaintiffs' allegation that the Guidelines "evidence a broader custom and unwritten policy at [the District] to exclude parents from making well-informed decisions regarding the education of their children as it pertains to transgenderism, sexual orientation, and diverging gender identity," [Doc. 64-2 at ¶ 149], the plain language of the Guidelines renders this allegation implausible.  *Brokers' Choice of Am.*, 861 F.3d at 1105; *Iqbal*, 556 U.S. at 678.  Thus, this Court finds that the Guidelines alone are inadequate to satisfy the Plaintiff Parents' obligation to plead sufficient facts of the existence of a District Secrecy Policy that precludes parents from accessing full and accurate information "regarding the best interests of their children, and . . . the nature of the District's curriculum."  *Cf. John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 622 F. Supp. 3d 118, 136 (D. Md. 2022).

### B.    Widespread Practice

Next, the Court considers the Plaintiff Parents' allegations that the District maintains "de facto" policies that "evidence a custom and unwritten policy of secrecy towards parents on matters regarding transgenderism, sexual orientation, and gender identity."  *See, e.g.*, [Doc. 64-2 at ¶ 223].  In order to adequately plead a cognizable custom or practice, the Plaintiff Parents must plead facts that demonstrate that the District employed a policy that was "so permanent and well settled as to constitute a custom or usage with the force of law."  *Bryson*, 627 F.3d at 788.  Even taking the factual allegations as true and drawing all inferences in favor of the Plaintiff Parents, this Court concludes that the allegations are insufficient to meet that threshold.

The Plaintiff Parents' allegations generally contemplate a broad, generalized informal policy "of concealing information relating to transgenderism from parents." *See, e.g.*, [Doc. 64-2 at ¶ 148]. However, "at the pleading stage, the existence of a *Monell* policy is a 'conclusion' to be built up to, rather than a 'fact' to be baldly asserted." *Sanchez v. City of Littleton*, 491 F. Supp. 3d 904, 923 (D. Colo. 2020) (quotation omitted). "In attempting to prove the existence of such a 'continuing, persistent and widespread custom,' plaintiffs most commonly offer [allegations] suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008); *Duran v. Colbert*, No. 2:16-cv-805 CW, 2023 WL 2742738, at *5 (D. Utah Mar. 31, 2023). While the Plaintiff Parents generally allege that "the Defendant engaged in a pattern and practice of keeping the GSA activities secret from parents," [Doc. 64-2 at ¶ 38], or "actively encouraged [students] to treat the [GSA] discussions as secret," [*id.* at ¶ 39], they identify actions with respect to the GSA at WMS only during a limited timeframe, and they do not have any factual allegations about similar conduct outside of WMS or outside of that timeframe.[8] *See, e.g.*, [*id.* at ¶¶ 61, 108]. There are also no allegations of the implementation of GSA clubs at the other nine schools in the District, *see* [*id.* at ¶ 36 ("[The District] runs ten GSA clubs at its schools.")], or examples from other schools where information about "transgenderism" was hidden from parents, *see generally* [*id.*]. Nor are there any allegations of similar conduct directed to other specific WMS students or parents; instead, the proposed First

---

[8] The Plaintiff Parents allege that in 2022, Mr. Benedict provided false information to the Lees by characterizing the relationship between C.L. and Ms. Riep as "not inappropriate." [Doc. 64-2 at ¶ 220]. To the extent that the Lees allege that this violated their constitutional rights, this Court notes that by 2022, C.L. was no longer a District student. [*Id.* at ¶ 90].

Addenda 068

Amended Complaint contains only allegations of specific instances of WMS personnel allegedly enforcing the District Secrecy Policy with the Plaintiff Parents. *See generally* [*id.* at ¶¶ 98, 122, 219]. The Juriches' allegations regarding H.J.'s experiences during the 2022–2023 school year at WMS do not pertain to any withholding of information through the GSA, Ms. Riep, or Mr. Benedict; the Plaintiff Parents simply allege that H.J. "expressed to her parents that she did not feel safe in a building with Jenna Riep, at which point Nick and Linnaea Jurich enrolled H.J. in a non-PSD charter school." [*Id.* at ¶ 136]. In other words, the Plaintiff Parents' allegations of an informal custom of secrecy are extrapolated from their *own* experiences with WMS staff. *See Dechant v. Grayson*, No. 2:20-cv-02183-HLT, 2021 WL 63280, at *2 (D. Kan. Jan. 7, 2021) (concluding that the plaintiff failed to plausibly allege an informal custom where his "broad allegations . . . stem[med] solely from [his] own encounter" with municipality employees); *see also Lavigne v. Great Salt Bay Cmty. Sch. Bd.*, No. 2:23-cv-00158-JDL, 2024 WL 1975596, at *7 (D. Me. May 3, 2024) (the plaintiff failed to allege a widespread policy "of withholding and concealing information respecting 'gender-affirming' treatment of minor children from their parents" where the plaintiff alleged only "one occasion" that a school employee withheld information from a parent).

Insofar as the Plaintiff Parents contend that the District Secrecy Policy extends to gender support plans, *see* [Doc. 64-2 at ¶¶ 184–190], there are no factual allegations to support the conclusion that information regarding the forms are kept secret from parents. The section of the Guidelines to which the Plaintiff Parents refer, *see* [*id.* at ¶ 189], cannot be fairly read to "contemplate the exclusion of parents in the submission of an Individual Gender Support Form," as the language expressly encourages the participation of

Addenda 069

parents and guardians, [*id.* at 52 ("There is no one best way to manage communication with classmates, parents/guardians, and staff. Therefore, it is helpful as the school counselor meets with the student and parents/guardians, if involved, to discuss if others are aware of the student's gender identity, if they plan to share this information, and whether they require communication or confidentiality from the involved staff member(s).")]. The Guidelines go on to explain:

> If a student initiates a conversation about needing support at school related to the student's gender identity or gender expression, the school counselor will encourage and discuss with the student how to inform and/or include the parent(s)/guardian(s) in this process. While it is not unusual for a student's identity to be first communicated at school, [the District] recognizes the importance of involving the student's parent(s)/guardian(s) to promote congruent and affirming environments through the student's daily experiences. If a student requests not to inform or include their parent(s)/guardian(s) at the time of creating or reviewing an Individual Gender Support Form, staff will work with the student to support them in their coming out process, and <u>there are exceptions for student safety</u>.

[*Id.* at 53 (emphasis added)]. Thus, read in context, the expectation is parent disclosure, with an exception for student safety. Indeed, there are no allegations contained in the proposed First Amended Complaint that would allow a factfinder to conclude that these Plaintiff Parents, or any other District parents, were provided incomplete or incorrect information regarding their child's gender support form.

Finally, as for the Plaintiff Parents' factual allegations regarding District employees trying to prevent disclosure of the District students' in-school pronoun usage to parents, *see, e.g.*, [*id.* at ¶¶ 210–15], these allegations do not plausibly establish the existence of a widespread, informal "secrecy" policy. Plaintiffs' allegations lack factual details about who these employees were, which District schools these employees worked at, when these employees took the alleged actions, or how often this alleged conduct occurred.

*Cf. Hernandez v. City & Cnty. of Denver*, No. 21-cv-01538-PAB-MEH, 2022 WL 3597452, at *5–6 (D. Colo. Aug. 23, 2022) (explaining that both the nature of the alleged similar incidents and the time frame in which those incidents occurred are relevant to the determination of whether the plaintiff's allegations are sufficient to allege a widespread practice) (collecting cases).  Conclusory allegations that unnamed District employees tried to circumvent the Synergy system "[o]n numerous occasions" or that one unnamed "medical staff" employee tried to circumvent FERPA requirements do not suffice to establish a widespread, informal custom that is "so permanent and well settled as to constitute a custom or usage with the force of law."  *Bryson*, 627 F.3d at 788; *cf Murphy v. City of Tulsa*, 950 F.3d 641, 649 (10th Cir. 2019) ("A single unconstitutional incident is ordinarily insufficient for municipal liability" unless that incident is "caused by an existing policy that can be attributed to a municipal policymaker." (cleaned up)); *Sodaro v. City & Cnty. of Denver*, 629 F. Supp. 3d 1064, 1082 (D. Colo. 2022) ("[T]wo incidents [of similar conduct] are insufficient to plausibly allege a widespread practice of constitutional violations similar to that alleged in the case, much less a practice so permanent and well settled as to constitute a custom or usage with the force of law." (quotation omitted)).  Furthermore, the allegations, as pleaded—particularly in the context of the Guidelines, discussed above—are distinguishable from the alleged constitutional violation in this case so as to not permit a plausible inference of a widespread informal practice "of concealing information relating to transgenderism from parents."  *See Hernandez*, 2022 WL 3597452, at *5 (factually dissimilar allegations do not lend plausible support to informal custom theory).

Addenda 071

Thus, this Court concludes that the Plaintiff Parents have failed to allege sufficient facts—as opposed to conclusory allegations—to establish that the Guidelines, along with other informal actions, amount to "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law."[9] *Bryson*, 627 F.3d at 788.[10]  For this reason, the Court concludes that amendment would be futile.  *Moody's Inv. Servs.*, 175 F.3d at 859.  Accordingly, the Motion to Amend is respectfully **DENIED**.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Plaintiffs' Amended Motion for Leave to Amend Complaint (Oral Argument Requested) [Doc. 64] is **DENIED**;

---

[9] There are no allegations that Ms. Riep or Mr. Benedict are final policymakers, or that the District ratified their actions, *see generally* [Doc. 64-2], nor do the Plaintiff Parents attempt to proceed on these theories, *see* [Doc. 64; Doc. 68].

[10] Having found that the Plaintiff Parents fail to allege sufficient facts to state a cognizable custom or policy to support Monell liability against the District, this Court need not decide whether they have alleged sufficient facts to plausibly allege that the District was deliberately indifferent to constitutional violations that were "the obvious consequence of its policy." *See Finch*, 38 F.4th at 1244; *see also Crowson v. Washington Cnty.*, 983 F.3d 1166, 1188 (10th Cir. 2020) (collecting cases)).  Indeed, this element was not raised by the District in opposition to the Motion to Amend.  However, the Court simply notes that the Plaintiff Parents only cursorily allege that the District "knew or should have known that the failure to provide notice, coupled with affirmative steps to discuss the topics secretly, would necessarily undermine parental authority and informed parental decision-making on whether to seek alternative education for their children."  [Doc. 64-2 at ¶ 147].  Without more specific factual details regarding what the District knew when it implemented the Guidelines that were effective as of May 2021, or what the District knew about employees' conduct vis-à-vis parents surrounding transgender or gender identification issues prior to May 2021, the Plaintiff Parents' allegations appear insufficient to satisfy the third element of a *Monell* claim.  *See Iqbal*, 556 U.S. at 678 (in the context of a motion to dismiss, holding that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").

(2)    Defendants are entitled to their costs pursuant to Federal Rule of Civil Procedure 54(d) and Local Rule 54.1; and

(3)    The Clerk of Court is **DIRECTED to CLOSE** this case.

DATED:  May 16, 2024                    BY THE COURT:

                                        Nina Y. Wang
                                        United States District Judge

Addenda 073

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01117-NYW-STV

JONATHAN LEE,
ERIN LEE,
C.L., a minor, by and through parents Jonathan and Erin Lee as next friends,
M.L., a minor, by and through parents Jonathan and Erin Lee as next friends,
NICOLAS JURICH,
LINNAEA JURICH, and
H.J., a minor, by and through parents Nicolas and Linnaea Jurich as next friends,

      Plaintiffs,

v.

POUDRE SCHOOL DISTRICT R-1, and
POUDRE SCHOOL DISTRICT R-1 BOARD OF EDUCATION,

      Defendants.

---

## FINAL JUDGMENT

---

      In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

      Pursuant to the Memorandum Opinion and Order entered by United States District Judge Nina Y. Wang on December 19, 2023 [Doc. 58], it is

      ORDERED that Defendants' Motion to Dismiss Plaintiffs' Complaint [Doc. 29] is GRANTED.  It is

      FURTHER ORDERED that Count I is DISMISSED without prejudice for lack of subject matter jurisdiction under Rule 12(b)(1) to the extent it is asserted by H.J., C.L., or M.L.  It is

Addenda 074

FURTHER ORDERED that Count I is DISMISSED without prejudice for failure to state a claim under Rule 12(b)(6) to the extent it is asserted by Jonathan Lee, Erin Lee, Nicolas Jurich, and Linnaea Jurich.  It is

FURTHER ORDERED that Count II is DISMISSED without prejudice for failure to state a claim under Rule 12(b)(6).

Pursuant to the Memorandum Opinion and Order entered by United States District Judge Nina Y. Wang on May 16, 2024 [Doc. 69], it is

ORDERED that Plaintiffs' Amended Motion for Leave to Amend Complaint (Oral Argument Requested) [Doc. 64] is DENIED.  It is

FURTHER ORDERED that final judgment is hereby entered in favor of Defendants Poudre School District R-1 Board of Education and Poudre School District R-1 and against Plaintiffs Jonathan Lee, Erin Lee, C.L., M.L., Nicolas Jurich, Linnaea Jurich, and H.J.  It is

FURTHER ORDERED that Defendants shall have their costs by the filing of a Bill of Costs with the Clerk of this Court within fourteen days of the entry of judgment, pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.  It is

FURTHER ORDERED that this case is closed.

Dated at Denver, Colorado this 17th day of May, 2024.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK

By: s/Emily Buchanan
Emily Buchanan, Deputy Clerk

Addenda 075